Belknap,
June 27, 1946. } No. 3547.

MEREDITH *v*. STATE BOARD OF HEALTH.

*Robert W. Upton* and *Richard F. Upton* (*Mr. Richard F. Upton* orally), for the plaintiff.

*Ernest R. D'Amours*, Attorney-General (by brief and orally), for the defendant.

BRANCH, J. The following facts are stated in the reserved case:

The town of Meredith is located on the northwest shore of Lake Winnipesaukee. The town has an area of forty-five square miles and a population of twenty-two hundred persons, of whom approximately fourteen hundred reside in the village of Meredith on the lake shore and the remainder in the rural sections of the town. The town has never had a public sewer system. Sewage disposal in the village section of Meredith has hitherto been and at the present time is met by property owners individually, including the town as proprietor of the town hall and fire station and the school district as proprietor of the public school houses. The town, the school district and the individual property owners maintain either earth privies, cesspools or septic tanks on their premises for sewage disposal. The village is built compactly and the surface soil is relatively impervious. For the removal of surface waters the town has constructed under and along Main Street a storm line or drain connecting with the lake. Sewer drains from some adjacent properties have been connected with the storm drain but without the consent of the town. The State Board of Health claims that these individual methods of sewage disposal constitute public nuisances and further that the sewage is finding its way from the village into Lake Winnipesaukee by seepage or overflow from privies, cesspools and septic tanks.

Lake Winnipesaukee is used as a municipal water supply by the city of Laconia and the village of the Weirs. Many littoral owners on the lake use its water for drinking and general household purposes. On June 21, 1907, the State Board of Health adopted certain rules

and regulations "for the protection of the purity of the waters of Lake Winnipesaukee and Lake Paugus," among which were the following:

"1. No sewerage from any town or village system of sewerage, or from any private sewer, or from any cottage, hotel, farmhouse, boarding-house, camp, or other abode, or from any privy, stable or outbuilding, shall be allowed to enter Lakes Winnipesaukee or Paugus. . . .

"4. No sewerage or drainage of any kind from any public building or buildings, and no animal or vegetable matter, or vehicle containing or having contained the same, and no deleterious matter of any kind shall be deposited in the waters of said lakes, or upon the banks of said lakes where it may contaminate the water of the same.

"5. Any town or city bordering upon the said lakes shall construct such sewerage systems as may be necessary to relieve any village or congested sections so that the inhabitants thereof may comply with these regulations."

Attested copies of these regulations and orders were posted by an agent of the board on September 12, 1933, at the town hall and post office in Meredith. One of the grounds upon which the plaintiff attacks the validity of these orders is that no notice of the meeting of September 21, 1907, or of its object was given to the town of Meredith or to any other town or person nor was any hearing granted by the board to the town of Meredith or to any other town or person.

The State Board of Health was organized under the provisions of Laws 1881, c. 64, (R. L., c. 147) which defines its duties as follows:

"5. DUTIES. They shall take cognizance of the interests of health and life among the people; shall make sanitary investigations and inquiries concerning the causes of epidemics and other diseases, the sources of mortality and the effects of localities, employments, conditions and circumstances on the public health; shall advise and assist town health officers in making investigations into sanitary matters in their towns and shall take measures to diffuse among the people such information on the subjects above named as may be useful."

Section 6 provides as follows:

"6. DRUGS; FOODS. They shall take cognizance of the interests of the public health, relating to the sale of drugs and foods and the adulteration of the same, and shall make all necessary investigations and inquiries in reference thereto. . . . "

By subsequent enactments the board is given certain duties and powers relating to communicable diseases; the distribution of antitoxin; the supervision of recreation camps; it is given power to ap-

point health officers and establish a laboratory of hygiene. It is given authority to provide for the protection of maternity and infancy; to administer plans for maternal and child health services. It is given authority to prohibit the use of common drinking cups and towels; to make regulations to avoid the spread of venereal diseases; to establish quarantines. By chapters 161 and 162 of the Revised Laws the board was given specific authority to appoint sanitary inspectors and supervise production of meat and food products and beverages. The control of cold storage plants has also been entrusted to the board, together with the enforcement of the statute regarding the purity and branding of foods and drugs. Of special importance to the present case are the provisions of chapter 165, authorizing the board to make regulations for the prevention and removal of nuisances, and chapter 166 giving the board wide powers for the protection of the sources of water and ice.

Section 12 of the present law (R. L., c. 147) entitled "POWERS," provides: "The State Board of Health shall have authority:

"III. To make such rules and regulations as it may deem necessary for the administration of the provisions of the preceding paragraphs."

It thus appears that the State Board of Health has been given wide authority to investigate and act in the field of public health in which expert investigations and findings may be necessary prerequisites to effective action and the general authority of the board has been frequently supplemented by additional grants of authority with reference to special situations. It is with reference to the board thus organized and empowered to act that we must consider the first question reserved by the Superior Court; namely, "Are the orders and regulations of the State Board of Health of June 21, 1907 and July 12, 1938 directing the town of Meredith to install 'a suitable public system of sewerage' in the village section of Meredith, within the powers conferred by statute upon the State Board of Health?"

The first and principal argument advanced by the plaintiff is that "the Legislature has granted to towns the option of deciding whether or not they will construct and operate public sewers (R. L., c. 111) and the decision of the towns under such local option is final."

By the provisions of R. L., c. 111, s. 3, the mayor and aldermen of any city are empowered to construct and maintain "all main drains or common sewers which they adjudge for the public convenience and health." Subsequent provisions provide for the construction and operation of such sewers as may be constructed and the establishment of sewer rents. The so-called local option provisions are found

in section 21 of the same chapter and are as follows: "21. APPLICA-TION OF CHAPTER. The provisions of this chapter shall be in force in such towns and village districts as may adopt the same; and the selectmen shall perform all the duties and possess all the powers in the town or district, as the case may be, conferred by this chapter upon the mayor and aldermen, and the rights of all parties interested shall be settled in the same way."

It should be noted that by the provisions of this section, chapter 111 is to be in force "in such towns and village districts as may adopt the same." Clearly the town of Meredith has not adopted the provisions of this chapter. On the contrary, it is plain that the selectmen have wholly failed to construct any sewers in accordance with the authority granted to them by section 3, and the constant effort of the town since 1933 has been to avoid the building of suitable sewers by opposing the efforts of the defendant to secure compliance with the regulations of 1907. Under these circumstances it is difficult to see how the town can rely upon this section in support of its claim that its right of local option in the matter of sewers has been infringed by the regulations and orders of the defendant. Under the provisions of section 21, failure to act is not equivalent of action, and the claim that any final action has been taken by the town falls to the ground.

The plaintiff's argument involves another fallacy in its assumption that the present case involves merely a question of sewers, whereas the regulations of 1907 state clearly that their purpose is "the protection of the purity of the waters of Lake Winnipesaukee and Lake Paugus." It is therefore obvious that the regulations here involved are not to be judged solely with reference to the statutory provisions regarding sewers but rather by the provisions of chapter 166 governing the protection of the sources of water and ice, and chapter 165 dealing with the prevention and removal of nuisances.

It was insisted at the oral argument as a fact of some importance that the state board was nowhere given specific authority to deal with the subject matter of sewers and hence it was contended that the orders of the board directing the establishment of a sewer system in the present case were invalid. This argument is both factually and legally unsound. Chapter 149 of the Revised Laws authorized the State Board of Health to employ a chemist who "shall make investigations and analyses of public water supplies . . . the disposal of sewage and similar matters of sanitation." R. L., c. 149, s. 2. This section clearly indicates the bestowal of some authority in regard to sewers upon the defendant.

Revised Laws, *c.* 166, *s.* 23, provides that no person proposing to supply water for domestic uses "shall construct any public system of sewage disposal, without first submitting detailed plans of the proposed construction to the state board and securing its approval thereof." Here again the authority of the board with reference to sewers is recognized. Similarly R. L., *c.* 166, *s.* 35 provides that "No person, association or corporation shall cause or permit the discharge of sewage or other deleterious waste from any dwelling, camp, factory, hotel, boarding-house, or other commercial establishment into any stream, lake, pond or river not hitherto polluted, without first submitting detailed plans of said proposed discharge to the state board of health and securing the approval of said board."

These provisions all demonstrate the fallacy of the plaintiff's argument that the entire subject of sewers has been committed to the towns, and the State Board of Health thereby precluded from exercising any authority with reference thereto.

Furthermore, if it were true, in fact, that the statutes of the State made no specific reference to sewers, we should have no hesitation in holding that the maintenance of proper sewers is a subject necessarily within the field of operations of a board charged with the duty of taking "cognizance of the interests of health and life among the people." R. L., *c.* 147, *s.* 5. It is inconceivable that by wholly failing to take action, any town can, with impunity, jeopardize the water supply and consequently the public health of a considerable portion of the State. Yet this is precisely what the plaintiff claims a legal right to do.

Another contention of the plaintiff is that "the power to make regulations is . . . not as broad as the power to regulate. The former implies authority to promulgate merely rules or laws general in their application, but the latter may include authority not only to make rules and regulations, but also to issue specific orders." It appears that the final order of the board in the present case directing the establishment of an adequate sewer system came at the end of a long controversy with the plaintiff town and was designed to make effective its rules and regulations previously promulgated. The case is, therefore, on all fours with *Niles* v. *Stream Control Commission*, 296 Mich. 650. In that case the city of Niles was ordered to establish a sewage system and sewage treatment plant in order to prevent the pollution of the St. Joseph River, and the court, in sustaining the order of the commission, said: "the . . . order was not arbitrary or unreasonable but became necessary by reason of the previous refusal

of the city of Niles to stop pollution of the stream." To the same effect are *Commonwealth* v. *Hudson*, 315 Mass. 335; *Commonwealth* v. *Sisson*, 189 Mass. 247; *Board of Purification of Waters* v. *Town of Bristol*, 51 R. I. 243; *Board of Health* v. *City of Greenville*, 86 Ohio St. 1. We are clearly of the opinion that in a situation like the present the power to make regulations includes the power to issue specific orders designed to compel compliance with general regulations previously issued.

The plaintiff seeks to distinguish the cases above cited upon the ground that the statutes under which the various boards acted gave them more specific authority than that conferred by the defendant in the present case. We do not think that the cases can be distinguished upon this ground. The power to make regulations must include power to make them operative by special orders when the "rules or laws general in their application" have been ignored or defied over a considerable period of time. No greater authority than that conferred in general terms upon the defendant was necessary to justify the order made herein.

It is further argued by the plaintiff that "to construe the statute as the State Board of Health contends, would make the town of Meredith responsible for nuisances maintained, not by itself, but by private citizens." We are told that "the present case is not one in which the town of Meredith is running a public sewer into Lake Winnipesaukee. There is no public sewer in the town." A sufficient answer to this argument is found in the findings of the Court which appear in the record as follows: "For the removal of surface waters the town has constructed under and along Main Street a storm line or drain connecting with the lake. Sewer drains from some adjacent properties have been connected with the storm drain but without the consent of the town." The words "without the consent of the town" obviously mean without the prior consent of the town. That the town officers have had actual knowledge of this condition can hardly be doubted in view of the long period of time which has elapsed since the initiation of these proceedings, and the absence of any statement in the record that efforts have been made to put an end to this condition sufficiently indicates that it is continued with the implied consent of the town. A storm drain carrying the sewage from an undisclosed number of adjacent properties with the knowledge and consent of the town is equivalent to a public sewer discharging into Lake Winnipesaukee.

It is also argued that the "heavy financial burden which the regula-

tions of the board would place upon the town is therefore to be considered in determining whether the Legislature ever intended a grant to the State Board of Health the power to make such regulations." We are told that "the cost of a sewer system such as required by the state board would probably exceed $160,000 at the present time;" that the borrowing capacity of the town is only $85,000, and that to raise the balance of $75,000 by direct taxation "would be a staggering tax burden for a municipality of the size of Meredith." It is conceded, however, that some relief in this situation is afforded by R. L., c. 72, s. 7, which permits municipalities to borrow money outside the debt limit for sewer systems when the cost thereof is to be financed by sewer rents or sewer easements.

The effects of this provision is more far reaching than the plaintiff perceives. In reality it wholly destroys the effect of the argument based on expense, for it indicates that the Legislature has recognized the imperative necessity for the establishment of sewers by providing that their cost shall not be subject to the ordinary limitations upon the public debt.

It is finally argued by the plaintiff that "Whether the public improvements which the State Board of Health seeks to have constructed should be carried out is properly a matter for decision of the Legislature after appropriate state-wide consideration." The argument that the construction of such a sewerage system as the board recommends would be a state-wide benefit and that, therefore, the State should share the cost, has some merit, although it cannot be accepted as decisive of the present case. Since these proceedings were instituted in 1933, six sessions of the Legislature have been held and no attempt to secure the assistance of the State in financing the proposed sewer system has apparently been made by the plaintiff. The question whether such aid should be furnished is not one for judicial determination.

The contention of the plaintiff that the regulations and orders here involved are not within the powers conferred upon the State Board of Health is, therefore, overruled.

It is our conclusion that sufficient authority for the action taken by the defendant in this case is to be found in the provisions of R. L., c. 165, dealing with the prevention and removal of nuisances, and chapter 166, dealing with the protection of sources of water and ice.

The second main ground upon which the plaintiff attacks the regulations in question is that if they were found to be within the statutory powers entrusted to the board, "the statutes are uncon-

stitutional and invalid as an attempted delegation of legislative power" and special reliance is placed upon the case of *Ferretti* v. *Jackson*, 88 N. H. 296, 297, 302. In that case the power of the milk control board to "fix just and reasonable minimum wholesale and retail prices" was held to be invalid, although the power of the board "to regulate and control the distribution and sale of milk" if it had been granted in the interests of public health was inferentially sustained. The Court found, however, that "The act shows no purpose of being a health measure." In that case reference was made to the decision in *Panama Refining Co.* v. *Ryan*, 293 U. S. 388, which announced the rule that in addition to a grant of authority "to selected instrumentalities for the purpose of ascertaining the existence of facts to which legislation is directed, . . . Congress . . . may establish primary standards, devolving upon others the duty to carry out the declared legislative policy, that is, as Chief Justice Marshall expressed it 'to fill up the details' under the general provisions made by the legislature."

The acts establishing the State Board of Health which is empowered to take cognizance of the interests of health and life among the people, fall within the above rule. The broad grants of authority to it involve expert investigations and findings not normally possible for the Legislature to make and hence properly delegable by it to a subordinate agency. Power to act in the interest of public health has certain obvious implications which do not require legislative definition in order to render the statute constitutional. The control of water supplies and public sewers is one of these necessary implications. The contention that the statutes here involved are unconstitutional is rejected.

The town finally comes to the highly technical position that "the regulations were not lawfully promulgated."

It is required by R. L., c. 166, s. 15, that regulations of the state board made thereunder must be filed with the town clerk, published in a newspaper, published in the county, and posted in two public places in the town. It appears that the regulations of 1907 were not posted in two public places in the town of Meredith until 1933 and have never been filed with the town clerk. It may be argued that the conduct of the defendant in requiring them to be posted in two public places, is to be regarded as equivalent to a finding that the board was proceeding under the provisions of this section, and that since the statute provides that regulations promulgated pursuant thereto "shall be in force" only when these requirements have been satisfied, the regulations of 1907 are not in force at the present time. Inasmuch

as these proceedings have been pending since 1933, however, the fact that the regulations of 1907 were not filed with the town clerk is a matter of slight practical importance to the plaintiff since the town has undoubtedly had actual notice of them for a much longer period and the technical defect in the publication may be remedied by now filing them with the town clerk. *State* v. *Wimpfheimer*, 69 N. H. 166, 171.

In regard to the order of June 12, 1938, no such question arises. The order may be, and probably should be, regarded as having its basis in R. L., *c.* 165, *s.* 2, which contains no requirement for either posting or publication. We, therefore, hold that the requirements of the state law governing the promulgation of regulations by the defendant have been sufficiently complied with.

The plaintiff takes the further position, however, that in promulgating its regulations, the defendant did not comply with the due process of requirements of the State and Federal constitutions. The argument is that the plaintiff was entitled to notice and hearing before the regulations were adopted and that, for this reason, their promulgation was unlawful. The answer to this argument is found in *Willis* v. *Wilkins*, 92 N. H. 400, 402, where it was said: "Boards of health act summarily, and it is the prevailing rule that they 'need not give notice of hearing to any person before they can exercise their jurisdiction for the public welfare, unless the statute under which they are authorized to act expressly so requires.' "

In *Dederick* v. *Smith*, 88 N. H. 63, 70, 71, we reached a similar conclusion, holding that the fourteenth amendment to the constitution of the United States "was not designed to interfere with the exercise of the police power of the states for the protection of the lives, liberty, and property of its citizens or for the promotion of the public safety, peace and order. . . . It cannot be supposed that the States intended, by adopting that amendment, to impose restraints upon the exercise of their powers for the protection of the safety, health, or morals of the community." *Mugler* v. *Kansas*, 123 U. S. 623. We, therefore, conclude that the regulations and orders of the board did not violate the constitutional rights of the plaintiff.

In accordance with the foregoing discussion, the first question reserved for our consideration by the Superior Court is answered in the affirmative, the second question is answered in the negative, and the third question is answered in the affirmative.

*Case discharged.*

JOHNSTON and KENISON, JJ., having been Attorneys-General, did not sit: the others concurred.