Original,
No. 6192.

EDWARD J. ROY & a.

*v.*

WATER SUPPLY AND POLLUTION CONTROL COMMISSION.

March 31, 1972.

*Devine, Millimet, McDonough, Stahl & Branch* and *Robert A. Backus* (*Mr. Joseph A. Millimet* orally) for the plaintiffs.

*Warren B. Rudman,* attorney general, and *Donald W. Stever, Jr.,* attorney (*Mr. Stever* orally), for the defendant.

*J. Francis Roche,* city solicitor (*Mr. Roche* orally), for the city of Manchester, intervenor.

KENISON, C.J. The questions presented by this case are whether the denial by the Water Supply and Pollution Control Commission (hereinafter the commission) of an application to extend a sewer line by the city of Manchester was within the commission's authority, whether the denial was reasonable, and whether the procedure of the commission afforded the interested parties due process of law.

The application was to extend the Christian Brook Sewer, a combination sanitary and storm sewer carrying both waste and surface drainage, to serve Bonaventure Manor, an apartment complex. According to the city engineer's analysis Bonaventure would add up to 0.57 cubic feet per second to the sewer's flow, which ranged from 0.40 c.f.s. to 9.73 c.f.s. dry weather flow at ten selected points. The addition would not increase the dry weather flow at any of the points to more than 7.5% of capacity.

Residents in the vicinity of North and Union Streets in a low area served by the sewer, opposed the application because they feared it would compound an already existing overflow problem during periods of intense rainfall. They testified that perhaps once a year there would be a storm of such intensity that the system would overflow in "geysers of raw sewage" which would flood their land causing property damage and requiring preventive medical treatment. This problem dated back over fifteen years, but had become more serious in recent times.

The commission held a hearing on its decision to deny the application at which letters from residents, newspaper articles, and past testimony were considered as well as testimony then received. The parties were not allowed to cross-examine the various witnesses at the hearing. Believing that it was "charged with the responsibility for preventing nuisance or danger to the public health and welfare resulting from the operation of sewerage facilities," the commission affirmed its denial because until the overflow problem had been remedied any extension would increase the volume, although not the frequency, of flooding. This decision was chosen as preferable to an alternative of granting the extension and recommending or ordering the city to find a solution. The plaintiffs, representing Bonaventure, appealed from the

decision to this court under RSA 541:6 and the city of Manchester was allowed to intervene because its rights might be affected by this decision.

Before discussing the questions presented it is useful to caution both ourselves and the commission with Professor Freund's praise of Justice Brandeis's sense of self-limitation, "[H]e would not be seduced by the quixotic temptation to right every fancied wrong that was paraded before him. The time was always out of joint but he was not born alone to set it right." Freund, The Supreme Court of the United States 130 (1961 ed.)

Both the issue of whether the commission had the right to approve or disapprove of the city's application and the issue of what general criteria must determine its decision are questions of law on review. RSA 541:13; *H.P. Hood & Sons, Inc.* v. *Boucher*, 98 N.H. 399, 101 A.2d 466 (1953); *Parker-Young Co.* v. *State*, 83 N.H. 551, 145 A. 786 (1929); 4 Davis, Administrative Law Treatise *ss.* 30.09, 30.11 (1958).

Laws 1947, ch. 183 enacted R.L. 166-A, Water Pollution and Disposal of Wastes (now RSA ch. 149), and established the Water Pollution Commission as an independent agency. Its primary duties were to investigate pollution of surface waters, to recommend classification of surface waters, and to enforce such classification. By Laws 1961, ch. 222 enacting RSA ch. 126-A, the Water Pollution Commission and the State Board of Health were transferred to the newly established Division of Public Health Services, Department of Health and Welfare. By Laws 1965, ch. 267, the Water Pollution Commission was again made an independent agency with expanded authority: "Wherever reference is made in Title X [Public Health] of the Revised Statutes Annotated and in the statutes generally to the department of health and welfare, division of public health services, in the field of recreation camps, public water supply, public sewerage and sewage treatment works, sewage disposal, public swimming pools and bathing places, protection of sources of water and ice, auxiliary public water supply, testing of public and private water supplies, it shall henceforth be construed to mean the water pollution commission." (Ch. 267:5). To reflect this expanded authority Laws 1967, ch. 147 changed its name

from Water Pollution Commission to Water Supply and Pollution Control Commission.

By expanding the commission's authority to include what had previously been the province of the State Board of Health, the commission's responsibilities expanded from merely protecting the surface waters of the State to taking "cognizance of the interests of health and life among the people." RSA 125:9 (dating from Laws 1881, 64:6 which established the State Board of Health).

Two statutes require that plans for the installation of sewerage be submitted to the commission. RSA 149:4 provides: "It shall be the duty of the commission and it shall have power and authority:

"V. To require the filing with the commission of plans and specifications of the installation of systems and devices for handling, treating, or disposing of sewage, industrial and other wastes, at least thirty days prior to the beginning of construction."

This was an original provision, R.L. 166-A:4, of the legislation creating the old Water Pollution Commission and appears incidental to the enforcement provision, R.L. 166-A:7 (now RSA 149:8(supp.)). RSA 148:25 provides: "II SEWAGE DISPOSAL SYSTEMS, CONSTRUCTION. Any person proposing to install new public sewerage or sewage treatment facilities, or to extend, renovate, replace or substantially repair any such existing facilities, shall submit, at least thirty days in advance of construction, detailed plans and specifications therefor to the division of public health services and secure its approval thereof." This provision originally required approval by the State Board of Health for new construction, Laws 1933, 12:1, and was amended to include changes in existing systems by Laws 1959, 93:1. Since Laws 1965, 267:5, it has required approval by the commission.

We recognize the strength of plaintiffs' argument that the authority to disapprove the extension of a sewer line should not be implied from RSA 149:4 and that, even if it is, the commission under chapter 149 could only judge according to the narrow criteria of whether the extension is harmful to the surface waters of the State. However, by the plain language of RSA 148:25 the commission has the authority

to disapprove of the extension and by the plain language of RSA 125:9 and the commission's history as the successor to the State Board of Health it is to judge according to the broad criteria of whether the extension is harmful to public health and life. *See Meredith* v. *State Board of Health,* 94 N.H. 123, 48 A.2d 489 (1946).

Plaintiffs advance several arguments against this position; we find them all to be without merit. First, they claim RSA 149:3-a(supp.) restricts the commission to consideration of dry weather flow. But, that section does not pertain to the commission's duties under RSA 148:25, nor to sewerage, as opposed to treatment facilities. Second, they claim the extension applied for is too insignificant to be of any importance. But, the statute does not warrant such a distinction, nor would it be unreasonable for the commission to regard a ten foot extension to serve one thousand people as more important than a one thousand foot extension to serve ten people. Third, they claim the commission is narrowly limited by the title of chapter 148 to protecting water and ice sources. But, such a construction is not compelled by the statute or its history, would ignore the policy of RSA 125:9, and would contradict RSA 148:23-a(supp.) which expressly provides that the commission consider the general needs of public health in ordering new sewage facilities.

The criterion of public health allows the commission broad discretion, but of course not so broad as to be without limit. The precise issue before the commission was whether the extension itself would endanger public health. The complaints of residents and of elected officials were irrelevant and not to be considered, except as they tended to show the extension would endanger public health. Denial of the city's application could not be used as an alternative to an order under RSA 148:23 to remedy an existing health problem, except as the extension itself tended to endanger public health. *See* Friendly, The Federal Administrative Agencies: The Need for Better Definition of Standards 19-26 (1962). And so we proceed to the question of whether there is support for the commission's finding that the extension would endanger public health.

We hold the commission's findings to be reasonable. There

was uncontradicted evidence that the periodic overflows are a hazard to health and are getting worse with time. We do not accept plaintiffs' argument that the additional 0.57 c.f.s. of sewage occasioned by the extension would be inconsequential. This argument is based on a comparison with the capacity of the sewer of 139, 182, and 192 c.f.s. at the three points measured in the area of the overflows. But we believe the proper comparison to determine the increase in contamination is not with the capacity of the sewer, but with the present dry weather flow of 4.17, 3.64, and 1.92 c.f.s. at the three points. Thus, the Bonaventure development would increase the flow of sewage there by 14%, 16%, and 30%; figures not clearly inconsequential to the health of the residents of the area. Moreover, it would not be unreasonable for the commission to recognize that the danger to the public health may be greater from numerous minor extensions than from a major extension and to prohibit all extensions whatsoever.

Intervenor argues RSA 149-E:3(IV)(supp.), Laws 1971, 444:6 (eff. July 1, 1971) only requires plans be submitted to the commission where the proposed sewage system will not be connected to a municipal system. But, that section only refers to the plans required by RSA ch. 149-E(supp.), not to the plans required by RSA ch. 148.

The due process requirements binding administrative procedure are quite different from those binding judicial procedure. *Federal Communications Commission* v. *Pottsville Broadcasting Co.,* 309 U.S. 134, 84 L. Ed. 656, 60 S.Ct. 437 (1940); 2 Davis, Administrative Law Treatise *s.* 14.08 (1958). In recognition of this difference plaintiffs have not emphasized their specific objections to the commission's acceptance of hearsay evidence and denial of cross-examination. Davis, Administrative Law Text *s.* 14.10 (1959). The hearsay evidence used in this case is entitled to consideration. RSA 541:17; *New Hampshire Milk Dealers' Ass'n* v. *New Hampshire Milk Control Bd.,* 107 N.H. 335, 222 A.2d 194 (1966). Although the commission is more than a mere investigatory body (*Hannah* v. *Larche,* 363 U.S. 420, 4 L. Ed. 2d 1307, 80 S.Ct. 1502 (1960)), where, as here, the commission decision is based more on its own expertise than on disputed testimony at a hearing and cross-examination does not appear

necessary for a full disclosure of the facts, we need not mandate the administrative process with the necessity of allowing cross-examination in the circumstances of this case. *See Origet* v. *Hedden,* 155 U.S. 228, 39 L. Ed. 130, 15 S.Ct. 92 (1894); 1 Cooper, State Administrative Law 373-74 (1965); Davis, *supra s.* 14.15(supp.); Jaffe, Judicial Control of Administrative Action 565-69 (1965). *Contra, Interstate Commerce Commission* v. *Louisville & N. R.R.,* 227 U.S. 88, 93, 57 L. Ed. 431, 434, 33 S. Ct. 185, 187 (1913). *Cf. Willner* v. *Committee on Character,* 373 U.S. 96, 10 L. Ed. 2d 224, 83 S.Ct. 1175 (1963) (see especially Justice Goldberg concurring, 373 U.S. at 107, 10 L. Ed. 2d at 232, 83 S.Ct. at 1182; *Greene* v. *McElroy,* 360 U.S. 474, 3 L. Ed. 2d 1377, 79 S.Ct. 1400 (1959); *Reilly* v. *Pinkus,* 338 U.S. 269, 94 L. Ed. 63, 70 S.Ct. 110 (1949)).

Considering the many statutes involved, the administrative proceedings in this case were at times understandably cloudy rather than crystal clear. It must be remembered that this commission, as well as the other administrative agencies in the State, operate without the benefit and guidelines of any State administrative procedure act. The remedy for this, if one is needed, is legislative and not judicial. However, all interested parties were afforded the opportunity to present their views, the facts themselves, as opposed to their relevance, were largely uncontested, and the commission reached a reasonable conclusion. We do not find any violation of due process.

*Appeals dismissed.*

All concurred.