Site Evaluation Committee
No. 6755

SOCIETY FOR THE PROTECTION OF NEW HAMPSHIRE FORESTS

AUDUBON SOCIETY OF NEW HAMPSHIRE

v.

SITE EVALUATION COMMITTEE

April 23, 1975

*Devine, Millimet, Stahl & Branch* and *Robert A. Backus (Mr. Backus* orally) for the plaintiffs.

*Wadleigh, Starr, Peters, Dunn & Kohls* and *Robert L. Chiesa* and *James C. Wheat (Mr. Chiesa* orally) for the defendant.

*Sulloway, Hollis, Godfrey & Soden* and *Martin L. Gross (Mr. Gross* orally) for the Public Service Company of New Hampshire.

*Warren B. Rudman,* attorney general, and *Donald W. Stever, Jr.,* assistant attorney general *(Mr. Stever* orally), as amicus curiae, representing the public interest.

KENISON, C.J. The Society for the Protection of New Hampshire Forests and the Audubon Society of New Hampshire (hereinafter the Societies) appeal from the decision of the site evaluation committee, a State administrative agency, approving the location of a nuclear generating facility in Seabrook, New Hampshire. RSA 162-F:10 (Supp. 1973) (Review; Electric Power Plant Siting and Construction Procedure); RSA 541:6. In his role as representative of the public interest the attorney general, who participated in the hearings before the committee, joins in the appeal. RSA 162-F:9 (Supp. 1973). The issues presented are: (1) whether the Societies were denied their constitutional and statutory rights by the committee's admitting certain evidence allegedly without providing for either cross-examination or rebuttal (U.S. CONST. amend. XIV; RSA 162-F:7 I (Supp. 1972), *as amended,* (Supp. 1973)); (2) whether in violation of the requirements of RSA ch. 162-F (Supp. 1973) the committee subdelegated its duty to ascertain the impact on water quality by the proposed facility's discharge of cooling water; and (3) whether the findings of the committee are legally sufficient.

On February 1, 1972, the Public Service Company of New Hampshire filed with the public utilities commission an application for a "certificate of site and facility", permitting construction of two 1100 megawatt nuclear generating units in Seabrook. RSA 162-F:6 I (Supp. 1973). A properly constituted "bulk power supply site evaluation committee", including representatives of the State agencies concerned, was activated to consider the Seabrook location. RSA 162-F:2 II (Supp. 1973), :3 (Supp. 1973).

After publishing notice on April 3, 1972, the commission and the site evaluation committee promulgated rules to govern the joint public hearings on the application, including provision for the cross-examination of witnesses (Rule 7). RSA 162-F:7 I (Supp. 1972), *as amended,* (Supp. 1973); RSA 162-F:7 VI (Supp. 1973). Pursuant to rules 4 and 8, the Societies and the Seacoast Anti-Pollution League were permitted to participate generally in the proceedings. The plaintiff Societies intervened primarily because of their concern "with suitability of the site from an environmental point of view . . . ."

During the hearings which commenced on June 19, 1972, a major issue was construction of the cooling system for the reactors. In the nuclear fuel cycle a large volume of cooling water is required for the condenser which converts steam generated as a result of nuclear fission into water. Cooling water may be provided through a "closed system" in which water is reused after exposure to the

air or through a "once-through system" in which the water may or may not be cooled before being returned to its source. Electricity and the Environment, A Report of the Association of the Bar of the City of New York 40 (1972).

The Seabrook proposal located the nuclear generating facilities on an area known as "The Rocks", adjacent to the Hampton-Seabrook salt marsh and about two miles from the Atlantic Ocean. To furnish sufficient cooling water (*i.e.* 364,000 gpm for each 1100 megawatt unit), the Public Service Company initially proposed a once-through system requiring installation of four buried conduits leading into the ocean, each nine feet in diameter. Construction of the conduits would have entailed excavation of a trench fifty feet wide through the salt marsh and building a pump house within Hampton Beach State Park. An intake apparatus for carrying cooling water through the pipes was to have been constructed underwater at a point about 4000 feet off Hampton Beach. The water heated as a result of passing through the condenser was to have been discharged through the pipes to a point 6000 feet offshore.

In the course of circulating through the system, ocean water would be heated as high as 45 ° F. above the ambient receiving water temperature. It was not disputed during the hearings that living organisms could not survive passing through the condenser due to the rise in temperature and extreme pressures. The original proposal raised recognized environmental hazards, including potentially irreparable destruction to the salt marsh caused by the excavation of trenches, damage to ocean biota caused by discharge of heated water (as well as of chemically treated water to prevent fouling of the system), and killing of organisms taken into (*i.e.* "entrained" by) the condenser cooling system. *See* 1 F. Grad, Environmental Law § 3.01, at 3-18 (1973); Bloch, *Nuclear Power Plant Proliferation*, 2 Environmental Law 373, 406 (1972). *But see* Merriman, *The Calefaction of a River*, 222 Scientific American 42, 52 (May 1970).

On March 8, 1973, in response to criticism of burying conduits in the salt marsh, the Public Service Company indicated that it was exploring the possibility of constructing two bedrock tunnels underneath the marsh and the ocean to carry the cooling water. Although the intake and discharge structures remained unchanged in the tunnel scheme, the necessity of trenching through the salt marsh was eliminated and the pump house was relocated from the public beach to the reactor site.

Two months later on May 21, 1973, the company announced that it had decided to use bedrock tunnels. Neither counsel for the Societies nor counsel for the public was present at the session since they had been advised that the two final hearings were reserved for committee questioning only. At the request of counsel for the Seacoast Anti-Pollution League, the committee ordered the Public Service Company to submit a detailed memorandum explaining how the tunnels would be installed and it was agreed that the intervenors would be allowed time to submit written interrogatories on the tunnel proposal. On the same day the committee digressed from its schedule to consider direct testimony and cross-examination of an expert on the feasibility of constructing tunnels for the Seabrook plant.

The proceedings of the site evaluation committee ended on May 25, 1973, after thirty-two days of hearings spread over almost one year during which 120 witnesses and statements were received (comprising about 5800 pages of testimony) together with 200 exhibits of approximately 3000 pages. Pursuant to the committee's order, the Public Service Company submitted a written report regarding construction of the tunnels. In closing the hearings the committee noted that the intervenors were allowed seven days to submit interrogatories on the tunneling scheme and that seven days would be allowed the company to respond.

The site evaluation committee issued a final report approving the application on July 27, 1973. *See* RSA 162-F:8 I (Supp. 1972), *as amended,* (Supp. 1973). The committee denied the Societies' motion for rehearing. RSA 162-F:10 (Supp. 1973); RSA 541:3. A "certificate of site and facility" incorporating the report of the site evaluation committee as well as reports of the water supply and pollution control commission, the air pollution control commission and two other State agencies affected, was issued by the public utilities commission on January 29, 1974. *See* RSA 162-F:8 I (a) to (d) (Supp. 1973).

## I. Opportunity for Cross-Examination and Rebuttal

The Societies request a limited new hearing because they contend that procedures followed by the site evaluation committee regarding the change from conduits buried in the marsh to bedrock tunnels underneath the marsh and the ocean for supplying cooling water violated the fourteenth amendment's guarantee of due process,

RSA 162-F:7 I (Supp. 1972), *as amended,* (Supp. 1973), and the committee's own rules.

Where issues of fact are presented for resolution by an administrative agency due process requires a meaningful opportunity to be heard. *Raper v. Lucey,* 488 F.2d 748, 753 (1st Cir. 1973); *Goldberg v. Kelly,* 397 U.S. 254, 267 (1970); *Ohio Bell Tel. Co. v. Comm'n,* 301 U.S. 292, 304-05 (1937); *see* 1 K. Davis, Administrative Law Treatise § 7.01, at 408 (1958) (Supp. 1970, at 301); *cf.* 5 U.S.C. §§ 554 (c) (1), 556 (d). In requiring "public hearings" on applications for site and facility, RSA 162-F:7 I (Supp. 1972) provided an opportunity to be heard. *See* RSA 162-F:1 (Supp. 1973), :9 (Supp. 1973). The 1973 amendments to RSA 162-F:7 I specified that "[s]ubsequent sessions of the hearing shall be in the nature of adversary proceedings" (effective September 4, 1973). *See* Lippek, *Proposed State Power Facility Siting Statute § IV(f) (7),* in *Symposium-The Location of Electricity Generating Facilities,* 47 Wash. L. Rev. 1, 64-72 (1971); Model State Administrative Procedure Act § 10 (3), Comment (1961). In this case the site evaluation committee gave the due process requirements vitality by promulgating rules allowing full participation by interested parties (rules 4 and 8) and preserving the participants' right to cross-examination (rule 7). RSA 162-F:7 VI (Supp. 1973).

The statutory requirements as they existed prior to September 4, 1973, were satisfied under the procedures followed by the committee on the tunneling proposal. Since the possibility was mentioned on March 8, 1973, as well as on March 23 and on April 13, the tunneling concept was not new to the plaintiffs. Although counsel for the plaintiffs was absent when the decision to use tunnels was announced on May 21, counsel for the Seacoast Anti-Pollution League (hereinafter the League) was present, "holding down the fort for the intervenors." In response to the League's request for detailed information on the feasibility and environmental impact of the decision to tunnel, the committee directed the Public Service Company to submit a complete memorandum. It was agreed that the memorandum would be circulated to all parties for examination and that they would be allowed time to respond by written interrogatories.

In reaction to questions raised by the League on May 21, the committee also requested an expert on tunnel construction to testify as to the engineering feasibility of tunnels for the Seabrook proposal. After giving direct testimony on tunnel construction, the

expert was questioned by five committee members and was cross-examined thoroughly by counsel for the League on the basis of available information.

When the hearings ended on May 25, the committee chairman emphasized that interrogatories on the decision to tunnel were due in seven days and that seven additional days would be allotted for the company to respond. Since the committee afforded the Societies adequate opportunity to develop and to respond to the factual issues presented, a new hearing limited to the decision to use tunnels is unnecessary.

## II. Subdelegation of Duties

The Societies further contend that the site evaluation committee subdelegated its responsibility for the impact of the Seabrook facility on water quality to the water supply and pollution control commission in·violation of the specific provisions of RSA ch. 162-F (Supp. 1973). As a result the Societies were allegedly denied their rights to a public hearing, including cross-examination guaranteed by RSA 162-F:7 (Supp. 1973). *See* RSA 149:8 III (Supp. 1972), *as amended,* (Supp. 1973); *Roy v. Water Supply Comm'n,* 112 N.H. 87, 92-93, 289 A.2d 650, 654-55 (1972).

Subdelegation in the administrative law context has been defined as "the transmission of authority from the heads of agencies to subordinates." 1 K. Davis, Administrative Law Treatise § 9.01, at 616 (1958) (Supp. 1970, at 401). Although until recently courts participated actively in controlling the supposed abuses of excessive subdelegation *(Id.),* the current attitude is one of judicial noninterference based on the realization that enormous administrative burdens face the delegating official. K. Davis, Administrative Law Text §§ 9.02, 9.03, at 217-18 (1972).

Whether there was a subdelegation of authority in this case depends upon the respective responsibilities for water quality assigned by statute to the site evaluation committee and to the water supply and pollution control commission. RSA ch. 149 (Water Pollution and Disposal of Wastes) created the water supply and pollution control commission, composed of thirteen members with expertise particularly suited to the supervision of water pollution problems. RSA 149:2 II, IV to VI (Supp. 1973). Among the specific statutory duties of the commission is "to study and investigate all problems connected with the pollution of ... surface waters ...."

RSA 149:4 II (Supp. 1973). Prior to discharging any "sewerage" or "waste" as those terms are defined in RSA 149:1 I-IV, a written permit must be obtained from the water supply and pollution control commission. RSA 149:8 III (a) (Supp. 1972), *as amended*, (Supp. 1973).

RSA ch. 162-F (Supp. 1973) (Electric Power Plant Siting and Construction Procedure) did not diminish the duties of the water supply and pollution control commission. Recognizing that "existing laws do not provide an adequate procedure for the coordination of reviews to assure protection of environmental values and certifying the construction, operation or maintenance of bulk power supply facilities . . . .", one of the explicit legislative purposes of RSA ch. 162-F is the resolution of environmental, economic and technical issues in an "integrated fashion". RSA 162-F:1 (Supp. 1973); *see* 1 F. Grad, Environmental Law §§ 1.01 [3] [a], 1.02 [2] [b] (1973); Note, *Federal and State Responsibility in the Environmental Control of Nuclear Power*, 2 N.Y.U. Rev. Law & Soc. Change 20, 32 (1972); Stone, *Power Siting: A Challenge to the Legal Process*, 36 Albany L. Rev. 1, 6 (1971); *see Calvert Cliffs' Coord. Comm. v. United States A.E. Comm'n*, 449 F.2d 1109, 1123 (D.C. Cir. 1971); *cf.* The Energy Reorganization Act of 1974 § 2(b), 88 Stat. 1233, Pub. L. No. 93-438 (Oct. 11, 1974); Sen. Rep. No. 93-980, 93d Cong., 2d Sess., at 4868 (1974); 42 U.S.C. § 4332 (National Environmental Policy Act, Cooperation of Agencies).

Toward this end RSA ch. 162-F (Supp. 1973) created the site evaluation committee which cooperates with the public utilities commission in having general responsibility for siting. RSA 162-F:2 II (Supp. 1973). In contrast to more specialized agencies like the water supply and pollution control commission, the site evaluation committee is composed of members with diverse expertise designed for overall coordination. RSA 162-F:3 (Supp. 1973).

No construction of a bulk power supply facility may begin without a certification of site and facility from the public utilities commission. RSA 162-F:2 I (Supp. 1973), :6 I (Supp. 1973). The public utilities commission, however, is bound by the findings of the site evaluation committee and is required to incorporate in its certificate "such lawful terms as may be supplied to it by the site evaluation committee . . . ." RSA 162-F:8 I, II (Supp. 1973).

Both the structure and the language of RSA ch. 162-F (Supp. 1973) presume continued participation and coordinated decision-making by other state agencies having particular expertise. Upon

receipt of an application for site and facility the public utilities commission and the site evaluation committee are required to hold a joint public hearing "with such other agencies as have jurisdiction over the subject matter . . . ." RSA 162-F:7 I (Supp. 1973); *see* RSA 162-F:7 IV (Supp. 1973). In the certificate of site and facility the public utilities commission "shall incorporate . . . such lawful terms as may be supplied to it by . . . those state agencies having permit or license granting responsibilities under state law." RSA 162-F:8 II (Supp. 1973); *see* RSA 162-F:8 IV (Supp. 1973).

The determination of impact on water quality is only one of many general findings that must be made by the site evaluation committee in its role as supervisor of siting; it has no statutory power to regulate how water quality is to be maintained. RSA 162-F:8 I (Supp. 1973). To discharge heated water and waste into the Atlantic Ocean from the Seabrook facility, the Public Service Company needed both a permit from the water supply and pollution control commission, and a finding from the site evaluation committee that the discharge would not adversely affect water quality. RSA 149:8 III (Supp. 1972), *as amended,* (Supp. 1973); RSA 162-F:6 I (Supp. 1973), :8 I (Supp. 1973); *see* 33 U.S.C. §§ 1251, 1311 (a), 1316 (a) (3), 1326, 1342 (b) (Supp. 1975) (Water Pollution Prevention and Control).

Pursuant to RSA 162-F:8 I, the site evaluation committee held public hearings and found that the discharge of cooling water would not adversely affect the environment. A final permit to discharge cooling water and treated wastes which detailed the manner and limits of discharge was issued by the water supply and pollution control commission on January 23, 1974. Both the findings and the permit were incorporated as parts of the certificate of site and facility issued by the public utilities commission on January 29, 1974. Since the site evaluation committee and the water supply and pollution control commission each fulfilled separate but coordinated functions in the authorization of siting the Seabrook facility under the statutory scheme of RSA ch. 162-F (Supp. 1973), no subdelegation occurred.

### III. Legal Sufficiency of Findings

Finally, both the Societies and the attorney general argue that the findings of the site evaluation committee are legally insufficient because they reiterate the language of RSA 162-F:8 I (Supp. 1973)

without indicating the committee's rationale for resolving disputed factual questions. The site evaluation committee found:

1. That it has given due consideration to the views of municipal and regional planning commissions and municipal legislative bodies concerned with the site and facility of the proposed nuclear project at Seabrook, . . . and that the site and the facility . . . will not unduly interfere with the orderly development of the region.

2. That the site and facility of the proposed nuclear project . . . will not have an unreasonable adverse effect on esthetics, historic sites, air and water quality, the natural environment and the public health and safety.

The committee did not indicate the basis for its findings.

Where the need for new sources of power may adversely affect the environment, the determination whether the findings of administrative agencies are sufficient necessarily entails weighing the competing values of administrative efficiency against deliberate and considered decision making. Leventhal, *Principled Fairness and Regulatory Urgency,* 25 Case W. Res. L. Rev. 66 (1974); Leventhal, *Environmental Decision Making and the Role of the Courts,* 122 U. Pa. L. Rev. 509, 510 (1974); *see* 1. F. Grad, Environmental Law § 1.02 (c), at 1-22 (1973); 42 U.S.C. § 4331 (a) (National Environmental Policy Act, Policies and Goals); Palfrey, *Energy and the Environment: The Special Case of Nuclear Power* 74 Colum. L. Rev. 1375, 1384 (1974). The tension between these values inheres in the expressed purpose of RSA ch. 162-F (Supp. 1973) to resolve environmental and economic issues in an "integrated fashion" while insuring an "adequate public voice" in the decision process. RSA 162-F:1 (Supp. 1973), :3 (Supp. 1973), :7 (Supp. 1973); *see* S. Ebbin and R. Kasper, Citizen Groups and the Nuclear Power Controversy 193-94 (1974); Electricity and the Environment, A Report of the Association of the Bar of the City of New York 129 (1972). In this context a court's role in reviewing the findings of an administrative agency is to insure that its efficient operation occurs within the confines of statutory requirements. RSA 162-F:10 (Supp. 1973); RSA 541:13; *see* Leventhal *supra,* 122 U. Pa. L. Rev. 509, 511 (1974); L. Jaffe, Judicial Control of Administrative Action 590 (1965); Palfrey *supra,* 74 Colum. L. Rev. 1375, 1396-97 (1974).

Both the state and federal courts have been uniform in recognizing the importance of findings in facilitating judicial review, pre-

serving agency prerogatives and encouraging deliberate decisions. *Hampton Nat'l Bank v. State,* 114 N.H. 38, 45, 314 A.2d 668, 674 (1974); 2 K. Davis, Administrative Law Treatise § 16.05, at 444 (1958) (Supp. 1970, at 573); *see* RSA 162-F:8 I (Supp. 1973); 5 U.S.C. § 557 (c) (A); Model State Administrative Procedure Act § 12 (1961). A reviewing court needs findings of basic facts to understand administrative decisions and to ascertain whether the facts and issues considered sustain the ultimate result reached. K. Davis, Administrative Law Text § 16.04 (1972); *see Wood County Bank v. Camp,* 348 F. Supp. 1321, 1324 (D.D.C. 1972); *California Motor Transp. Co. v. Public Utilities Comm'n,* 59 Cal. 2d 270, 274, 379 P.2d 324, 327 (1963).

On the federal level there has been an additional requirement that agencies give reasons for findings. 5 U.S.C. § 557 (c) (A); *see* Gardner & Greenberger, *Judicial Review of Administrative Action and Responsible Government,* 63 Geo. L.J. 7, 33 (1974); *Greater Boston Television Corp v. FCC,* 444 F.2d 841, 850-51 (D.C. Cir. 1970). "Reasons differ from findings in that reasons relate to law, policy, and discretion rather than to facts." 2 K. Davis, Administrative Law Treatise § 16.12, at 476 (1958); *see id.* § 16.14, at 587 (Supp. 1970). While this court has repeatedly recognized the need for basic findings supported by the record, it has not mandated detailed and specific reasons for the basic findings. *Trustees of Lexington Realty Trust v. Concord,* 115 N.H. 131, 336 A.2d 591 (1975); *N.H.-Vt. Physician Serv. v. Durkin,* 113 N.H. 717, 724, 313 A.2d 416, 421 (1973). Nor do the relevant model state acts. *See* Lippek, *Proposed State Power Facility Siting Statute* § *IV(f),* in *Symposium-The Location of Electricity Generating Facilities,* 47 Wash. L. Rev. 1, 69-71 (1971); Model State Administrative Procedure Act § 12 (1961).

Whether the findings of an administrative agency are sufficiently specific depends upon the nature of the administrative proceeding. *Hampton Nat'l Bank v. State,* 114 N.H. 38, 44-45, 314 A.2d 668, 673 (1974). In *Hampton National Bank* this court found that the five basic factual findings of the board of trust company incorpation were sufficient to support the ultimate conclusion that public convenience would be promoted by a new bank. *Id.* at 44, 314 A.2d at 673. Where, as in this case, the administrative agency is required by statute to make not only general discretionary findings such as the effect of the nuclear facility on esthetics and historic sites, but also complex factual determinations of its effect on regional development, air and water quality, the natural environment and

the public health and safety, the law demands that findings be more specific than a mere recitation of conclusions. *Id.* at 44-45, 314 A.2d at 674; *New England Tel. & Tel. Co. v. State,* 113 N.H. 92, 95, 302 A.2d 814, 817 (1973); *N.H.-Vt. Physician Serv. v. Durkin,* 113 N.H. 717, 724, 313 A.2d 416, 421 (1973).

The site evaluation committee must furnish basic findings of fact to support the conclusions that the statute requires it to make. K. Davis, Administrative Law Text § 16.04 (1972); *see* Model State Administrative Procedure Act § 12 (1961). It will be sufficient in this case if the committee focuses on and makes explicit those basic findings drawn from the evidence that led it to decide as it ultimately did and indicates the experts or expert evidence upon which it relied. For example, the conclusion that the Seabrook facility will not have an unreasonable adverse effect on the natural environment must be supported by specific basic findings of fact delineating the probable effects which the discharge of heated and chemically treated water will have on the plant and animal life in the area. Similarly, there must be specific basic findings of fact with regard to regional development, air and water quality and the public health and safety. To the extent that the same basic findings of fact support more than one conclusion, they may be combined.

Requiring the site evaluation committee to make basic findings is not an exercise in futility. *See* L. Jaffe, Judicial Control of Administrative Action 589 (1965). Basic findings will promote a one-step review process in which the substantive and procedural issues can be considered simultaneously. 2 K. Davis, Administrative Law Treatise § 16.05, at 444 (1958); Electricity and the Environment, A Report of the Association of the Bar of the City of New York 266 (1972). In addition the requirement will preclude the necessity of the court delving into a complex, voluminous record to make findings of its own. *See* Leventhal, *Environmental Decision Making and the Role of the Courts,* 122 U. Pa. L. Rev. 509, 511 (1974). Finally, in the process of making basic findings the committee will be compelled to weigh with care the evidence before it and to delineate the basic facts supporting its conclusions, thereby rendering the process of public hearings more meaningful to the participants. S. Ebbin and R. Kasper, Citizen Groups and the Nuclear Power Controversy 188-89 (1974); Electricity and the Environment, A Report of the Association of the Bar of the City of New York 8, 142-43 (1972); *see* Muchnicki, *The Proper Role of the Public in Nuclear Power Plant Licensing Decisions,* 15 Atomic Energy L. J. 34, 46 (1973).

Nor will the requirement that the committee make basic findings unduly burden it. The site evaluation committee is composed of trained professionals who are specifically authorized by statute to facilitate their task with legal and investigative expertise. RSA 162-F:3 (Supp. 1973); RSA 162-F:7 V (Supp. 1973).

This case is remanded for the limited purpose of requiring that the site evaluation committee provide basic findings of fact on the existing record to support the ultimate conclusions it has reached.

Accordingly, it is

*So ordered.*

All concurred.