Carroll
No. 79-158

ERNEST R. BELLEAU & a.

v.

HENRY C. HOPEWELL, JR., & a.

January 31, 1980

*Cooper, Hall & Walker*, of Rochester (*Donald F. Whittum* orally), for the plaintiffs.

*Charles G. Cleaveland*, of Nashua, by brief and orally, for the defendants.

KING, J. The plaintiffs brought suit to recover a real estate broker's commission from the owners of three parcels of land located on Lake Winnipesaukee. At the close of the plaintiffs' case, the defendants' motion for nonsuit was granted as to the plaintiff, Ernest

R. Belleau, Jr., by the Trial Court (*Loughlin*, J.); the jury returned a verdict of $35,000 in favor of plaintiff, Wayne R. Blanchard. We dismiss defendants' appeal.

In 1958, Vera Hopewell conveyed property to the defendants as trustees and named them as sole beneficiaries under the trust. In 1974, the defendants decided to sell the land and at various times engaged several real estate brokers under open listing arrangements. One of these brokers was Murton Sudikoff, a Massachusetts real estate broker. In May of 1974, at Sudikoff's request, Henry Hopewell had his brother, Frank Hopewell, confirm the open listing by letter. The letter indicated that the Hopewell's Wolfeboro attorney, Jerry Thayer, would have a set of keys for the Winnipesaukee property should they be needed.

On April 19, 1975, Wayne Blanchard, a real estate broker, spoke with Henry C. Hopewell, Jr., at the Kingswood bank in Wolfeboro. Blanchard indicated that he had heard that the property was available for sale and asked if he could have a listing. Hopewell testified that he responded by saying, "Come to me with a check and an offer and I will discuss the matter with my brothers." He also testified that at no time did he agree to pay Blanchard a commission. Blanchard testified, however, that Hopewell agreed to give him a listing and that, in response to a question about financing, Hopewell said, "Bring me a contract, bring me a deposit and we will talk about it." Nevertheless, both parties agree that Hopewell answered several of Blanchard's questions concerning the property and indicated that the selling price of the property was $500,000, exclusive of commissions. Blanchard also testified that Hopewell told him that a copy of the plan could be obtained from the surveyor, Wayne Kelloway, and that Attorney Thayer could be contacted for information regarding access and the "legal aspects" of a possible sale.

Hopewell then left the bank and immediately thereafter Blanchard discussed the listing with the plaintiff Belleau. The two agreed to co-broker the sale. Blanchard obtained copies of the plan and from April 1975 to June 1976, Blanchard and Belleau showed the property to at least twenty-one potential buyers. On April 23, 1976, the Hopewells entered into a written exclusive listing with Sudikoff.

Between April 1975 and June 1976 Blanchard contacted Attorney Thayer approximately once every six weeks to make sure the property was still available and to let Thayer know that he was actively showing the property. At the same time, Belleau was sending out individual inquiries, listing the property in real estate journals and advertising the property in various newspapers. As a result of the Belleau advertisements in the Lakes Region area, Belleau received a phone

call in early June from Omer Gingras. Blanchard arranged to meet Gingras in New Hampshire and to show him among other listings the Hopewell property. He showed Gingras and his family the interior of the main building, the various outbuildings and the shore frontage of the Hopewell property. When the keys of the main house were not found in their customary location, the group opened unlocked windows and entered the premises.

At this time, Belleau quoted a selling price of $575,000. Although interested, Gingras said he could not afford that sum. Belleau suggested that Gingras put $75,000 down and make a counter-offer Gingras informed Belleau that he was in the process of selling a business in Massachusetts and that such sale would have to take place before he could decide on the Hopewell property. Belleau gave Gingras a copy of the plan.

Following the view of the Hopewell property, Gingras saw an advertisement which he "had a feeling . . . was the same" property which had been shown to him by Belleau and Blanchard. This led to a telephone call to Sudikoff's office. Thereafter, Sudikoff by a phone call informed Gingras that he had the exclusive listing in the Hopewell property at a price of $500,000. Gingras informed Sudikoff that he was very interested and did not have to see the property as he had already seen it. However, Gingras would not disclose to Sudikoff the name of the person who showed him the property. After viewing the Hopewell property again and after negotiations with Sudikoff, Gingras made another offer of $350,000 which the defendants accepted. A purchase and sale agreement was entered into on August 9, 1976. Defendants knew of the plaintiffs' claim several days prior to the closing but still paid Sudikoff his full commission.

■■ Defendants first argue that there was no contract to pay a commission. Questions as to what agreement was made between the real estate owner and broker regarding commissions are for the trier of fact. *F. A. Larson Realty Co., Inc. v. Hayes*, 114 N.H. 501, 323 A.2d 914 (1974); *Gingras v. Stark Estates, Inc.*, 109 N.H. 242, 248 A.2d 86 (1968). Evidence was introduced at trial that Hopewell granted Blanchard a listing and discussed the sale price, the availability of a survey, access to the building, and who Blanchard should contact for the legal aspects of a sale. While there was no express statement about the payment of a commission, it is clear that the jury could reasonably find that such an agreement arose from the conversation and that the parties understood that the usual and customary commission would be paid in the event Blanchard produced a buyer.

■   Defendants next argue that there was insufficient evidence from which the jury could find that Henry C. Hopewell, Jr., had authority to bind his brothers, Robert and Frank Hopewell. An agent has authority to bind his principal if the agent has been given actual authority to do so or if the principal has conducted his business so as to give third parties the right to believe that the act in question is one he has authorized his agent to do. *Record v. Wagner*, 100 N.H. 419, 421, 128 A.2d 921, 922-23 (1957); *Davison v. Parks*, 79 N.H. 262, 263, 108 A. 288, 289 (1919).

■   In the instant case, it is not disputed that the Hopewell brothers were trying to sell their property. To that end, Hopewell and his brothers engaged brokers at various times. In addition, Hopewell informed Blanchard of the net selling price, directed him to the surveyor from whom he could obtain a survey, and also directed him to an attorney from whom he could inquire about the "legal aspects" of a sale. There is no evidence that the other brothers, Robert and Frank, placed any limitation on the authority of their brother or anyone else in connection with the listing of their property. We conclude that there was sufficient evidence for the jury to find that Hopewell had actual authority to bind his brothers and also apparent authority in that a reasonably prudent person in Blanchard's position would believe from the brothers' method of conducting the sale that Hopewell had authority to act on behalf of his brothers in listing the property.

■   Defendants next argue that even if there was a contract, it was terminated by plaintiffs' abandonment and failure to perform within a reasonable time. Because no time for performance of the listing agreement was specified the agreement must be performed within a reasonable time. *Leavitt v. Fowler*, 118 N.H. 541, 391 A.2d 876 (1978); *see Smith v. B., C. & M. Railroad*, 36 N.H. 458 (1858). In considering what was reasonable in these circumtances and whether the plaintiffs had abandoned their efforts to sell the property, the jury could properly consider the nature and location of the property, the numerous conversations with the defendants' attorney, the number of prospective purchasers shown the property, the initial conversation with the ultimate purchaser, the prior efforts of the Hopewell brothers to sell the property, their continued telephone discussions with Gingras and the fact that Gingras' offer was the first firm offer received by the defendants during the two years in which the property had been available for sale. The jury could reasonably find that the plaintiffs never abandoned their efforts to sell the property to Gingras and that plaintiffs performed within a reasonable time.

■ Defendants argue that plaintiffs were in breach of a fiduciary relationship for failing to communicate to their principal all relevant information concerning arrangements to sell the property. The Hopewells, however, were primarily interested in a contract for the sale of the property and a deposit to bind the party. There is no evidence that they wanted information on each prospect personally.

■ Defendants next argue that the evidence is insufficient to support a finding that plaintiffs were the effective cause of the sale. A broker earns a commission when he is the effective cause of the sale of property which he is authorized to sell. *Williams v. Walker*, 95 N.H. 231, 61 A.2d 522 (1948); *Philbrick v. Chase*, 95 N.H. 82, 58 A.2d 317 (1948). It is not necessary that the broker participate in the final negotiations leading to the sale. *Kopka Real Estate, Inc. v. MacLeod*, 119 N.H. 547, 404 A.2d 298 (1979); *DiMarzio v. Read*, 118 N.H. 925, 395 A.2d 1253 (1978); *Williams v. Walker supra.* Nor does the fact that the seller was unaware that the broker showed the property to the buyer free the seller from responsibility for the commission. *Monadnock Ins. Agency Inc. v. Manning*, 117 N.H. 508, 374 A.2d 961 (1977).

■ Therefore, plaintiffs, after finding the prospective customer and commencing negotiations, should not be deprived of their commission because another broker finalized the sale, even though the sale was for a price less than the initiating broker was empowered to receive. This is especially so if the owner had not informed the plaintiffs that he had entered into a written agreement of sale with Sudikoff after entrusting the sale of the land to Blanchard. *See* 12 AM. JUR. 2d *Brokers* § 230, at 974.

In this case, it is not disputed that Gingras was led to the property by Belleau and Blanchard and that he viewed the property with them on or about June 8, 1976; that Gingras was interested in the property from the time he first saw it; that he informed Sudikoff he had already seen the property; that on June 11, 1976, he made a written offer to purchase the property for $300,000; and that this offer was the first firm offer received by the defendants during the two years. We find that there was sufficient evidence from which the jury could find that the plaintiffs were the effective cause of the sale to Gingras and entitled to the commission.

■ Defendants also argue that plaintiffs are estopped from claiming a commission because the sellers were unaware of the plaintiffs' involvement with the purchaser. Reliance is placed on the dissent in *Monadnock Ins. Agency, Inc. v. Manning supra.* In that

opinion Chief Justice Kenison, with Justice Douglas concurring, pointed out that reason favors placing the burden on the professional broker to inform his inexperienced client, the seller, when he has shown the property to a prospect. Even if the dissent were the law, it would not apply in this case, because evidence was presented that Hopewell did not wait expectantly for news that the property was being shown. Rather he instructed Blanchard that the plaintiffs should contact Attorney Thayer about "access" and "any legal aspects of a possible sale," and that they should only contact the Hopewells when the plaintiffs had a deposit and a contract for sale. The jury could reasonably have found that in failing to notify the defendants of the Gingras showing the plaintiffs merely followed the defendants' instructions.

■■■■■ The defendants next contend that the trial court's charge to the jury was defective. In deciding such a claim, the proper inquiry is whether the charge, as given, adequately sets out the applicable law. *Kennedy v. Ricker*, 119 N.H. 826, 409 A.2d 778 (1979); *Poulin v. Provost*, 114 N.H. 263, 319 A.2d 296 (1974). In this case, the trial judge in his charge properly instructed the jury that: "the legal duty of the plaintiff in acting, if you find he was acting, on behalf of the defendant, consisted in being the *effective cause* of procuring a customer, willing and able to buy upon the terms proposed by the owners." (Emphasis added.) Once the applicable law has been set out along with each party's claims, other instructions are in the trial court's discretion. *Kennedy v. Ricker supra; Allen v. State*, 110 N.H. 42, 260 A.2d 454 (1969). Defendants argue that the exclusion by the trial court of certain testimony by the buyer was prejudicial error. Defendants sought to introduce evidence of a pretrial statement given by Gingras on November 22, 1976, during defendants' objection to plaintiffs' *ex parte* attachment. The offered testimony was as follows:

Q. Mr. Gingras, who do you feel was the—the agent who brought about the sale insofar as you were concerned?

A. I would say Mr. Sudikoff because I was able to—I had a lot of room for negotiation with him, started from $400,000, $175,000 less than they were asking for. And—room for negotiation which naturally it is a proven fact, I got it for $350,000. This is—that's where my interest lies.

■■■■ Plaintiffs duly objected to the testimony and the court sustained the objection. The test for admissibility of opinion evidence is whether, within the discretion of the presiding justice, it may aid the jury in their search for truth. *Gauthier v. Bergeron*, 107 N.H. 153, 154,

218 A.2d 433, 434 (1966); *Walker v. Walker*, 106 N.H. 282, 284, 210 A.2d 468, 470 (1965). The trial court, in sustaining plaintiffs' objection, very carefully and succinctly stated its reasons, which included specific findings that Gingras was not an objective and disinterested witness and that the questions involved the crucial or ultimate issue in the case. We find that the trial court did not abuse its discretion.

■ Taking the trial court's charge as a whole, we find that "it fairly presented the case to the jury in such a manner that no injustice was done to the legal rights of the litigants." *Poulin v. Provost*, 114 N.H. 263, 264, 319 A.2d 296, 297 (1974); *see State v. Wentworth*, 118 N.H. 832, 395 A.2d 858 (1978). We therefore find no prejudice to the defendants in the charge which requires setting aside the verdict.

*Exceptions denied; appeal dismissed.*

GRIMES, J., did not sit; the others concurred.