Strafford
No. 86-093

ROLAND J. PLACE

v.

LINDA J. PLACE

April 3, 1987

*Cooper, Hall, Whittum & Shillaber P.C.*, of Rochester (*Donald F. Whittum* on the brief and orally), for the plaintiff.

*Ralph Stein*, of Salem, by brief and orally, for the defendant.

*Edwinna C. Vanderzanden*, of Dover, by brief, as guardian ad litem for Jennifer and Deborah Place.

BATCHELDER, J. The defendant mother appeals a final award of physical custody of the parties' two daughters to the plaintiff father. We affirm the award.

The defendant raises five issues on appeal: whether the court erred (1) in applying to the issue of custody the standards applicable to a change of custody; (2) in not requiring the guardian ad litem to submit a written report at a reasonable time prior to the final hearing; (3) in not interviewing the two children; (4) in making certain findings of fact based on medical reports that were not introduced into evidence at the final hearing; and (5) in making certain allegedly inconsistent and unsupported findings concerning the defendant's psychological fitness. We find no error.

The plaintiff petitioned on February 13, 1985, for legal separation of the parties and custody of the two children, Jennifer, then almost thirteen years old, and Deborah, then almost seven. On March 7, 1985, the Superior Court (*Nadeau*, J.) held a hearing on temporary custody. Neither the plaintiff nor his counsel attended the hearing, as counsel was appearing on that day in a jury trial. Based on the defendant's offers of proof, the court awarded temporary custody to the defendant.

On March 12, 1985, the plaintiff petitioned for a rehearing and for court-ordered counseling and the appointment of a guardian ad litem for the children. The court granted the motions and held a new hearing on June 27, 1985, at which the guardian ad litem orally reported her findings based on several interviews. The record suggests that at that time she orally recommended that the father have physical custody of the girls. Following the hearing, the court rescinded its previous order and entered a decree of temporary custody in favor of the father.

On January 3, 1986, the Superior Court (*Gray*, J.) held a final hearing. The guardian ad litem did not submit a report at that time,

but questioned several witnesses in a way that showed her position in favor of the plaintiff. Again, neither party called the guardian ad litem to testify. At the close of evidence, the defendant did not object to the guardian ad litem's request for permission to submit her report later, and she submitted it on January 10. The court issued its order on January 16.

At the heart of this case lies the trial court's decision to award physical custody of the children to the father despite repeated testimony that they had stated a preference for their mother. The trial court believed that the wishes of the children are of less legal significance than the best interests of the child. In that vein, the trial court found that the defendant was psychologically unstable with respect to the older daughter's medical condition and would probably "continue to transfer her own psychological instability to the parties' children if she is granted custody." More specifically, the court found the defendant was "unable to cope with the fact that her daughter, Jennifer, has no objectively determinable symptoms of serious illness . . . ." The court also found that the records of the New England Medical Center indicate a concern that the defendant "might subject Jennifer 'to repeated and unnecessary and possibly invasive medical investigations.' " The trial court denied the defendant's request to find that "[t]here was no evidence before the court to warrant a finding that Jennifer Place suffers from Manchausens (sic) syndrome by proxy." We note that Munchausen syndrome is the "fabrication . . . of a clinically convincing simulation of disease. . . ." STEDMAN'S MEDICAL DICTIONARY (Fourth Unabridged Lawyers' Edition) 1386 (1976). We have not found a dictionary definition of Munchausen syndrome by proxy, but we accept the definition supplied in the record by Dr. DeJohn that it is a condition in which the patient simulates symptoms suggested by another person.

### A. *The Court's Standard For Determining Custody*

■■ The defendant points to the final sentence of the trial court's order to show that the court applied the wrong standard. In pertinent part, that sentence reads: "[T]he Court sees no reason, at this time, to transfer custody to the Defendant." The defendant correctly states that a party desiring a change in a decree awarding sole custody bears a heavy burden. *Perreault v. Cook*, 114 N.H. 440, 443, 322 A.2d 610, 612 (1974); *see Butterick v. Butterick*, 127 N.H. 731, 734–35, 506 A.2d 335, 337–38 (1986). *Perreault* declared:

"The relationship established by the custody award should not be disturbed unless the moving party demonstrates that the circumstances affecting the welfare of the child

have been so greatly altered that there is a strong possibility the child will be harmed if he continues to live under the present arrangement."

*Id.* The defendant also is correct that the *Perreault* standard's heightened concern for the stability of a final decree does not apply to a parent seeking to modify a temporary custody decree. *Greenglass v. Greenglass*, 118 N.H. 570, 573, 391 A.2d 890, 892 (1978).

■ We disagree with the defendant's reading of the trial court's order. It is clear to us that the trial court did not apply the *Perreault* standard. The court stated, "By the granting of the prior requests, the Court is stating that while the Defendant may be a 'suitable parent', the Plaintiff, at this point, is the more 'suitable parent.' " The simple fact that modifying the temporary decree so that the defendant would get custody would be a transfer of custody, and that the court used the word "transfer" to describe such a modification, does not mean that the court imposed any heightened burden on the defendant in her attempt to gain the transfer.

B. *The Guardian Ad Litem's Report*

The defendant asserts that the trial court denied her due process by not giving her the opportunity to challenge the guardian ad litem's report. More specifically, the defendant claims that, because the guardian ad litem submitted the report a week after the final hearing, the defendant could not review it and examine the guardian or call as witnesses persons mentioned in the report. As authority for the proposition that due process requires that she have an opportunity to challenge the report at the final hearing, the defendant refers us to *Provencal v. Provencal*, 122 N.H. 793, 451 A.2d 374 (1982).

■ The guardian ad litem is primarily an advocate for the best interests of the child and also assists the court and the parties in reaching a prompt and fair determination, while minimizing the bitterness in this process. *Id.* at 796–97, 451 A.2d at 376–77; *see* RSA 458:17-a. In *Provencal,* we held that the trial court erred in ordering that the guardian's report remain confidential, unavailable even to the parties and their attorneys. In the instant case, the court did not order secrecy but allowed the report to be submitted a week after the hearing.

■ We find no error. The defendant had ample opportunity to question the guardian at the hearing, but did not call her. The defendant neither objected to the late submission of the report nor requested an opportunity to reply to it. These decisions were made

when the defendant knew the guardian's position, as the guardian had delivered a report orally at the June 27 hearing and had made her position clear at the January 3 hearing through the questions she asked witnesses. In conclusion, we believe the court did not deprive the defendant of an opportunity to challenge the guardian's report.

C. *The Court's Decision Not To Interview The Children*

The defendant urges that the court abused its discretion in declining to interview the children. Citing RSA 458:17, VI; *Butterick v. Butterick*, 127 N.H. 731, 506 A.2d 335 (1986); and *Richards v. Richards*, 125 N.H. 331, 480 A.2d 155 (1984), the defendant argues that the court should have considered the children's preference, especially as the older daughter was fourteen years old on the effective date of the order. The defendant also places great weight on RSA 463:14, which permits a minor above the age of fourteen to elect any suitable person for his or her guardian.

We start by correcting the defendant: RSA 458:17, VI says the court *may* consider the child's preference, not that it *should* consider that preference. We add that the statute's permission to take the preference into consideration does not limit that consideration to an interview of the child. Third, we point out that RSA 463:14 does not apply in the present context. That statute must be read in the context of the whole of RSA chapter 463, which concerns the powers of the probate court to appoint a guardian for a minor. Under RSA 463:1, the probate court's power does not depend on the filing of a divorce libel. In fact, the type of guardian envisioned by RSA chapter 463 need not be either parent, and will often be appointed precisely because neither parent is fit to have custody or control of the child. *See* RSA 463:6.

In the context of child custody in divorce proceedings, the most this court has relied on RSA 463:14's provision for the election of a guardian by a minor over the age of fourteen is to recognize a legislative declaration that in an analogous context a child is mature enough to choose. *See Provencal v. Provencal*, 122 N.H. 793, 799, 451 A.2d 374, 378 (1982). The legislature has made no such declaration in regard to custody in divorce proceedings, even though other jurisdictions have done so. *See* GA. CODE ANN. § 30-127 (1981) (preference of child fourteen years old or older controls, unless preferred parent is unfit). We have also considered the importance of a mature child's preference apart from RSA 463:14. In *Butterick v. Butterick*, *supra* at 734–35, 506 A.2d at 337–38 in order to best serve the interest of a mature child, we modified the *Perreault* standard for

transfer of custody by allowing the trial court to consider the wishes of such a child. We noted, repeating our observation in *Provencal*, that the preference of a mature fourteen-year-old will usually be crucial. Nonetheless, we were careful to state in *Butterick v. Butterick, supra* at 735, 506 A.2d at 338, "We leave the determination of whether a child is mature to the sound discretion of the trial judge."

Paragraph 10 of the court's order states that the court took the children's preference into consideration, but did not interview them because "there was no question in the parties' minds, nor the Court's, as to the preference of the children." In *Butterick*, we cautioned the trial courts to consider whether the child's preference was based on undesirable or improper influences. *Id.* at 735, 506 A.2d at 337–38. In the present case, there was evidence showing that the girls' statements stemmed from a fear of rejection by their mother. The record contains ample evidence, including a psychological report on Jennifer done by the New England Medical Center, from which the court could have assessed Jennifer's maturity. In summary, the court did not abuse its discretion in declining to interview the children.

■ We cannot overemphasize the delicacy of interviewing a child to discover his or her preference. The legal and psychological literature abounds with warnings about how disturbing divorce is to children. The courts must be sensitive to any inquiry that increases the pressure on a child trying to cope with his or her parents' divorce. *See, e.g.*, Jordan, *When In Doubt, Keep The Child Out*, 6 FAM. ADVOC., no. 4, at 10 (Spring 1984); Wood, *The Child as Witness, id.* at 14–19; Schepard, *Taking Children Seriously: Promoting Cooperative Custody After Divorce*, 64 TEX. L. REV. 687, 703 (1985). The court must also be sensitive to the effect of the divorce on the perceptions and motives of the child. *See, e.g.*, Wallerstein, *The Child in the Divorcing Family*, 19 JUDGES' J., no. 1, at 17 (1980). In this light, we see no value in constraining the statutory discretion granted by RSA 458:17, VI to the trial court, and we find no error in the trial court's decision not to interview the children.

### D. *The New England Medical Center Reports*

■ While the defendant is correct that the plaintiff did not introduce any medical reports from the New England Medical Center into evidence at the final hearing, we nonetheless believe these reports were in evidence. The plaintiff had appended to his March 12, 1985 motion for rehearing a copy of the New England Medical Center's five-page discharge summary for Jennifer. The plaintiff appended the New England Medical Center's psychological evalua-

tion of Jennifer to his motion for court-ordered counseling pursuant to RSA 458:7-b and for appointment of guardian ad litem, filed on the same date. Furthermore, these reports were the subject of examination and cross-examination of three of the witnesses at the final hearing. The defendant did not object when the plaintiff cross-examined both Pamela Battin-Sacks, a family therapist with the Youth and Family Division at the Strafford Guidance Center, and Dr. James DeJohn, a Rochester pediatrician, on their use of the reports. On direct examination, the defendant asked Dr. John Shearman whether he agreed with the medical report's findings concerning Jennifer's Munchausen syndrome. Additionally, the plaintiff requested the court to make findings consistent with the substance of the reports. The defendant made no objection at that time, despite the contemporaneous objection rule of the New Hampshire Rules of Evidence. N.H. R. Ev. 103(b)(1). Given these facts, it is not plausible that the defendant truly believed the medical reports were not in evidence, or that the hearing judge did not, and should not, have known their contents.

E. *The Effect Of The Inconsistent Findings Of Fact*

The defendant points out that the trial court made inconsistent findings regarding her psychological condition. The defendant argues that inconsistent findings "cannot be supported by the evidence and hence must be overturned."

Specifically, the contradictory findings are:

> "The defendant, for whatever reason, is unable to cope with the fact that her daughter, Jennifer, has no objectively determinable symptoms of serious illness and is psychologically unstable at the present time." (Plaintiff's Request 14)

> "It is more probable than otherwise that the defendant will continue to transfer her own psychological instability to the parties' children if she is granted custody." (Plaintiff's Request 15)

> "Other than the residual effects of a motor vehicle accident the Defendant was in in 1984, there are no physical or psychic reasons which would prevent the Defendant from functioning as a custodial parent." (Defendant's Request 18)

> "There was no evidence before the Court to warrant a finding that Linda Place is not a qualified parent." (Defendant's Request 4)

The court concluded in its order that the defendant "may be a suit-

able parent" and "in no way inferred that she is incapable of caring for her children."

 This court has never fixed a standard for measuring parental fitness, yet it is patent that a psychologically unstable parent is not a fit parent. Nonetheless, even if we were to disregard the medical reports and accept the defendant's claim that the trial court was plainly wrong that the defendant was psychologically unstable, the trial court's findings still sufficiently support the custody order. The standard for determining which parent should have custody is the best interest of the child. *See* RSA 458:17, I. In that light, we note that the trial court found that (a) the New England Medical Center worried that Mrs. Place would subject Jennifer "to repeated and unnecessary and possibly invasive medical investigations"; (b) the plaintiff "provides a more stable and healthy psychological environment for Jennifer"; and (c) the plaintiff is economically better able to provide a healthy homelife for the children. In short, even were we to accept that the inconsistent findings were an error, they are harmless. A harmless error is an error that does not affect the outcome. *See Welch v. Gonic Realty Trust Co.*, 128 N.H. 532, 536, 517 A.2d 808, 810–11 (1986). Given the trial court's findings and the standard it correctly applied, the inconsistencies did not affect the outcome.

*Affirmed.*

All concurred.