Board of Registration in Medicine
No. 88-143

PETITION OF BETTY SPRAGUE

PETITION OF DAVID C. WHITENACK, M.D.
(New Hampshire Board of Registration in Medicine)

October 6, 1989

*Wiggin & Nourie*, of Manchester, and *Civil Practice Clinic*, of Concord (*Edward L. Cross, Jr.*, and *Bruce E. Friedman* on the brief, and *Mr. Cross* orally), for petitioner Betty Sprague.

*Aeschliman & Tober P.A.*, of Portsmouth (*Stephen L. Tober* on the brief and orally), for petitioner David C. Whitenack.

*Stephen E. Merrill*, attorney general (*Douglas N. Jones*, assistant attorney general, on the brief and orally), for the State, as *amicus curiae*.

JOHNSON, J. Petitioner Betty Sprague petitions this court pursuant to Supreme Court Rule 11 to vacate a decision of the State Board of Registration in Medicine (the board), which denied the imposition of sanctions against Dr. David C. Whitenack for the treatment he rendered her, and to impose sanctions against Dr. Whitenack. In a cross-petition, Dr. Whitenack argues that the correct evidentiary standard to be applied by the board in a disciplinary proceeding is "clear and convincing evidence" rather than the "preponderance of evidence," and that the board erred in applying the lesser standard. For the reasons which follow, we vacate the decision of the board and remand. We do not at this time instruct the board to use any standard other than the "preponderance of the evidence" standard.

In April 1986, Betty Sprague began to see Dr. Whitenack, a psychiatrist licensed to practice medicine in New Hampshire, for counselling. Ms. Sprague initially saw Dr. Whitenack, who diagnosed her as suffering from an adjustment disorder with anxiety features, once a week. Soon, however, she began to visit him twice a week, until August 1986, when she voluntarily terminated the therapy. Soon after terminating therapy with Dr. Whitenack,

Ms. Sprague sought the advice of a number of other mental health professionals as to whether the treatment she had received from Dr. Whitenack had been appropriate.

In October 1986, Ms. Sprague sent a complaint to the board in which she alleged that a number of incidents had occurred during the course of her therapy with Dr. Whitenack which she characterized as "questionable" and "inappropriate." These included Dr. Whitenack's hugging her, kissing her, using erotic language, telling her intimate details of his life, and about drinking with patients, joking about a gun he kept in the office, displaying a lack of awareness of the drug Xanax (a charge that was later withdrawn), and revealing to her the name of another patient. Ms. Sprague sent an almost identical complaint to the Ethics Committee of the New Hampshire Psychiatric Association.

After conducting a preliminary investigation, which included interviews with both Ms. Sprague and Dr. Whitenack, the board decided that it would hold hearings to determine whether Dr. Whitenack had acted inappropriately and whether it would impose sanctions against Dr. Whitenack, which could include the revocation of Dr. Whitenack's license to practice medicine. *See* RSA 329:17, VII. Prehearing conferences, intended to narrow the factual issues, were held in the summer and fall of 1987. On November 13, 1987, a one-day, twelve-hour evidentiary hearing was held before the board.

An examination of the record reveals agreement by the parties as to a number of important facts. No party disputes that Dr. Whitenack hugged Ms. Sprague at the close of a number of treatment sessions. Dr. Whitenack asserts that the hugs, which he described as the kind he would give his children, were intended to convey support for the patient's "tentatively offered inner emotions." Ms. Sprague recognized that the hugs were part of Dr. Whitenack's style in practicing psychiatry. With regard to the kisses, the board concluded that Dr. Whitenack had kissed Ms. Sprague on the top of her head on three occasions, as Ms. Sprague alleged. Although Dr. Whitenack could not recall kissing Ms. Sprague, he did not dispute that the incidents may have occurred, and he asserted that a nonerotic kiss could show support for a patient, and thus be beneficial to the patient. Ms. Sprague agreed that the kisses were not erotic in nature. The record makes it clear that the claim of misconduct was not based primarily on the mere occurrence of the physical acts themselves. Rather, Ms. Sprague's counsel argued that Dr. Whitenack had been negligent, immoral,

and unprofessional in his actions, given the probable perception of these acts by Ms. Sprague and his intent in performing them.

Ms. Sprague's perception was influenced, her counsel argued, by an intense "transference" directed towards Dr. Whitenack. Transference is a term used to denote a patient's emotional reaction to a therapist and is "generally applied to the projection of feelings, thoughts and wishes onto the analyst, who has come to represent some person from the patient's past." STEDMAN'S MEDICAL DICTIONARY 1470 (4th Lawyers' ed. 1976). Experts have viewed transference as crucial for a successful therapeutic process because "[i]t is through the creation, experiencing and resolution of ... feelings [which the patient may have repressed towards the past figure] that [the patient] becomes well." *See L.L. v. Medical Protective Co.*, 122 Wis. 2d 455, 461, 362 N.W.2d 174, 177 (Wis. App. 1984) (quoting D. DAWIDOFF, THE MALPRACTICE OF PSYCHIATRISTS 6 (1973)). Both parties agree that Ms. Sprague developed feelings of transference during her therapy with Dr. Whitenack.

Ms. Sprague's counsel characterized the transference as "eroticized." Eroticized transference has been defined as "... an intense, vivid, irrational, erotic preoccupation with the analyst, characterized by overt, seemingly ego-syntonic demands for love and sexual fulfillment from the analyst." H. Blum, *The Concept of Eroticized Transference*, 21 JOURNAL OF AMERICAN PSYCHOANALYTIC ASSOCIATION 63 (1973). Thus, although according to Dr. Whitenack, the hugs and any kisses that may have been given were intended to convey support and acceptance of Ms. Sprague, according to Ms. Sprague, she perceived them as sexual in nature, thus fueling her intense emotional and physical attraction to the doctor.

It is also undisputed that the doctor used commonplace "street language" to describe sexual acts during at least one therapy session with Ms. Sprague. Ms. Sprague testified that the use of such language served to intensify her feelings for the doctor. Dr. Whitenack testified that he had made a particular statement containing such language following Ms. Sprague's description of a sexual fantasy that she had had involving considerable force and violence. Dr. Whitenack testified that he believed that Ms. Sprague, by revealing the fantasy, was asking him to accept her and be supportive. His use of this "street language," he suggested, had to be understood in this context.

It is also undisputed that Dr. Whitenack told Ms. Sprague that he owned a gun. Ms. Sprague testified that Dr. Whitenack offered her the use of his gun. Dr. Whitenack denied he had offered her use of the gun. Rather, he testified that he had told her that

"sometimes when people are so control oriented ... they're safer ... if they have some means to take control," and that his "shorthand way ... of asking people of ... how suicidal they might be was to ask them if they needed a gun."

It is undisputed as well that Dr. Whitenack revealed to Ms. Sprague a number of facts about his personal life. Ms. Sprague testified that she had found these revelations "tantalizing." Dr. Whitenack testified that he had supplied these facts in answering direct questions asked by Ms. Sprague, and that doing so was consistent with his general therapeutic approach.

It is also undisputed that Dr. Whitenack drank with a few patients during therapy sessions and revealed this fact to Ms. Sprague. Dr. Whitenack testified that there were three or four patients with whom he had a beer at each session and that he scheduled them as the last session of the day. He testified that he was certain that he had mentioned this fact to Ms. Sprague in response to a statement of hers, although he could not recall what it was.

Counsel for Ms. Sprague argued before the board that the use of hugs, kisses, and erotic language, as well as the revelation of personal details of his life, the suggestion that she could use his gun, and discussion of drinking, as treatment for a woman undergoing intense transference, was clearly negligent. He suggested that Dr. Whitenack, in using these techniques, served to gratify his own emotional needs rather than enhance Ms. Sprague's emotional well-being.

It is also undisputed that during the course of a therapy session with Ms. Sprague, Dr. Whitenack revealed the name of a former patient. The revelation was made in response to a direct question as to whether the person who had formerly treated Ms. Sprague, and had recommended Dr. Whitenack to her, had seen Dr. Whitenack professionally. Dr. Whitenack testified that he answered her question because of the importance of being "consistent and not back[ing] away." He stated: "I don't think you can expect somebody to tell you their deepest things ... if you're going to turn your back on them." He also stated that he knew the patient well and believed he would not have objected to his revealing his name. He also testified he believed Ms. Sprague already knew the answer to the question.

Following this long, one-day hearing, the board issued an 18-page decision. The majority of the board found that although "Dr. Whitenack probably could have been more diligent and more disciplined in directing Ms. Sprague's therapy," he had not been

negligent in his treatment of Ms. Sprague. *See* RSA 329:17, VI(d). It also found that Dr. Whitenack had not exploited Ms. Sprague. *See id.* The board found that Dr. Whitenack had acted unethically in disclosing to Ms. Sprague the name of a former patient in violation of his duty not to reveal patient confidences. *See id.* However, although the disclosure was unethical, the "special relationship" which existed between Dr. Whitenack, Ms. Sprague and the other patient "minimize[d] the significance of the Respondent's error." The board therefore declined to impose any disciplinary sanctions on Dr. Whitenack for the violation. *See* RSA 329:17, VII.

One member of the board dissented from the decision. He agreed with the majority that Dr. Whitenack had not acted immorally or negligently. He believed, however, that Dr. Whitenack's failure "to refer Ms. Sprague to another psychiatrist ... after it became apparent that he was having difficulty managing her eroticized transference," was unprofessional, and that the board should have issued a letter of reprimand which also recommended further training on the handling of eroticized transference. Ms. Sprague filed a motion for rehearing which was denied in a four-page order. Because RSA 329:17, VIII provides for an appeal pursuant to RSA chapter 541 only when the board has taken disciplinary action, Ms. Sprague filed a petition for writ of certiorari with this court, pursuant to Supreme Court Rule 11, which was accepted.

Ms. Sprague claims error by the board on a number of grounds. She claims that the board conducted itself in a manner which was contrary to the requirements of due process, the provisions of RSA chapter 541-A, and the board's own rules and regulations. Specifically, she argues that the board unfairly restricted her right to cross-examine Dr. Whitenack, issued one-sided discovery rulings, wrongfully excluded relevant evidence, failed to act on a request for findings of fact and rulings of law, and exhibited bias and prejudgment. She also claims that the board's failure to find Dr. Whitenack guilty of immoral, unprofessional or negligent conduct was against the clear weight of the evidence, and that the board abused its discretion by refusing to impose even the mildest sanctions on Dr. Whitenack for his breach of patient confidentiality.

We first examine Ms. Sprague's claim that the board denied her an adequate opportunity to cross-examine Dr. Whitenack by limiting both the time for the cross-examination and the scope of the questions which could be asked. Both the Administrative Procedure Act and the rules formulated by the board provide for the cross-examination of witnesses. We therefore examine these

requirements first, and only if necessary address her due process claim. *See Bedford Residents Group v. Town of Bedford,* 130 N.H. 632, 638, 547 A.2d 225, 229 (1988). RSA 541-A:18, IV (Supp. 1988) states that a "party may conduct cross-examinations required for a full and true disclosure of the facts." New Hampshire Administrative Rules, Med 204.04(b) requires that "[o]pportunity shall be afforded to either party to cross-examine each witness of the other party at the conclusion of the witness' direct testimony." Under RSA chapter 329, Ms. Sprague is considered a "party." *See* RSA 329:18, I, :18, III. Although the opportunity for cross-examination is guaranteed to a complainant in a disciplinary hearing before the board, neither the statute nor the rule entitles the complainant to unlimited cross-examination. Cross-examination must be allowed only to the extent necessary for a full and true disclosure of the facts. RSA 541:18, IV (Supp. 1988); *cf. Roy v. Water Supply Comm'n,* 112 N.H. 87, 92-93, 289 A.2d 650, 654 (1972) (discussing requirements of due process).

In the instant case, the board limited the cross-examination of Dr. Whitenack by Ms. Sprague's counsel both temporally and in scope. Direct examination of Dr. Whitenack by his attorney and the board filled sixty-five pages of the transcript. Ms. Sprague's counsel then began the cross-examination, which continued for what Ms. Sprague's counsel believed was ten minutes (twenty-two pages of the transcript), but a board member said was "a lot longer," when the board called for a five-minute break in the proceedings. Ms. Sprague's counsel, when warned that his cross-examination might be curtailed after the break, stated, "I think ten minutes for a key witness is going to be hard to explain." The board's counsel replied, "You're right, it probably will be and I don't like that anymore [sic] than you do." When the board's own counsel expresses concern about the board's limitation of cross-examination, our finding of arbitrariness by the board can be made rather easily.

Over his protest, Ms. Sprague's counsel was requested to complete the cross-examination of Dr. Whitenack after the break, if possible, in fifteen minutes. The board chairman had complained that the cross-examination was covering ground already covered. This statement by the chairman displays his lack of understanding of the role of cross-examination, given that cross-examination, almost by definition, is a review of direct examination in order to determine the veracity, accuracy and depth of knowledge of the witness. Cross-examination resumed after the break until the board's counsel said, "I think your fifteen minutes has just about elapsed," and the chairman stated, "That's it. He is done." Counsel

for Ms. Sprague took exception to the limitation of his cross-examination, and the chairman replied, "That's all right." The transcript of testimony from after the break until the point when Ms. Sprague's counsel was cut off by the chairman covers nineteen pages.

■ Upon examining the record, we find that the cross-examination permitted did not allow for a full and true disclosure of the facts. The arbitrary limitation upon cross-examination by Ms. Sprague's counsel denied her an opportunity to explore actions allegedly taken by Dr. Whitenack that she contended exhibited misconduct on his part. Although many of the facts concerning what had taken place were not in dispute, there was certainly no agreement by the parties concerning Dr. Whitenack's intent in undertaking certain actions and how they related to treatment goals. Since allowing cross-examination of Dr. Whitenack was essential to understanding whether he had engaged in prohibited conduct, the arbitrary time limit placed on cross-examination denied Ms. Sprague an adequate opportunity to cross-examine Dr. Whitenack, and therefore to obtain a full and true disclosure of the facts. *See* RSA 541-A:18, IV (Supp. 1988).

At one point, Ms. Sprague's counsel stated, "I am going to finish up now." Shortly thereafter, he was abruptly cut off because he had apparently run over the time in which he was to complete cross-examination. The board should have known that the cross-examination phase of the proceeding was coming to a close, and the arbitrary limitation of what appeared to be the final avenue of cross-examination constituted error. Upon remand, Ms. Sprague's counsel should be given an opportunity to make an offer of proof as to what is to be covered in his final cross-examination so that the chairman of the board can make a reasoned decision as to whether the cross-examination will assist the board.

■ We note, however, that the board's limitation of the cross-examination does not display bias on the part of the board, as argued by Ms. Sprague. The direct examination of Dr. Whitenack, supplemented by the board's questions, provided a seemingly complete examination of each allegation contained in Ms. Sprague's complaint. The limitation imposed by the board displayed a lack of understanding by the board as to the important role of cross-examination in ferreting out the truth, *see generally* MCCORMICK ON EVIDENCE § 31 (3d ed. 1984), rather than bias or prejudgment.

Ms. Sprague also claims error by the board in limiting the scope of the cross-examination of Dr. Whitenack. Specifically, she objects to the board's ruling that Ms. Sprague's counsel could not question Dr. Whitenack concerning the consensus of opinion in the psychiatric community relative to certain actions he had taken. The board's counsel stated that the board would not allow Ms. Sprague to "use [Dr. Whitenack] as her expert." At the outset, we note that Ms. Sprague does not claim that Dr. Whitenack gave an opinion regarding the consensus in the medical community in his direct testimony and that her counsel was later denied an opportunity to challenge that opinion on cross-examination.

The board possesses discretion to determine the scope of cross-examination. *See Comm'n on Med. Discipline v. Stillman*, 291 Md. 390, 422, 435 A.2d 747, 763 (1981); *cf. State v. Sands*, 123 N.H. 570, 612, 467 A.2d 202, 229 (1983) (trial judge has broad discretion to determine scope of cross-examination). Such a determination, however, must not serve to prevent a full disclosure of the facts necessary for a fair hearing as guaranteed by RSA 329:18, I. We hold that the board in the instant case did not abuse its discretion. Prohibiting Ms. Sprague's counsel from questioning Dr. Whitenack concerning his opinion as to the consensus in the medical community would not deny Ms. Sprague a fair hearing, especially when she intended to call her own expert witness and the board had provided for a neutral witness to testify as to whether the actions taken by Dr. Whitenack met professional standards.

The board's decision on the merits of the case relied greatly on Dr. Whitenack's testimony and its judgment that such testimony was credible. Failure to allow adequate cross-examination in these circumstances cannot necessarily be deemed a harmless error, *see Appeal of Nationwide Ins. Co.*, 120 N.H. 90, 94, 411 A.2d 1107, 1109 (1980), and we therefore remand the case. Because the opportunity for further cross-examination would not serve to make fair a hearing which has suffered from other infirmities, we go on to address Ms. Sprague's other claims.

Ms. Sprague contends that the board issued "one-sided" discovery requests. We disagree with Ms. Sprague's characterization of the board's discovery rulings and the implication of bias such characterization carries. The board issued a number of orders regarding discovery in this case. Some were favorable to Ms. Sprague; some were not. For the reasons which follow, we hold as well that the discovery rulings which were made by the board were not in error.

Although the board has discretion regarding discovery, *see* N.H. ADMIN. RULES, Med 203.02(a), it cannot exercise its discretion arbitrarily or so that it serves to deny a party a fair hearing. *See* RSA 329:18, I (requiring all complaints to be fairly heard by the board). Because of what she considered the prohibitive cost of taking a deposition of Dr. Whitenack, Ms. Sprague served more than 150 interrogatories on him. Although Dr. Whitenack answered the great majority of the interrogatories to the satisfaction of Ms. Sprague's counsel, he gave no answer, or what in Ms. Sprague's counsel's opinion were incomplete answers, to a number of them. Ms. Sprague's counsel therefore filed motions to compel Dr. Whitenack to answer, or to provide more specific answers to, certain interrogatories. At the final preliminary hearing, the board ordered that answers be made to many of the interrogatories over the vehement objection of Dr. Whitenack's counsel, who was then preparing for another trial. The board, however, did not require answers to all of the interrogatories cited in the motions.

The majority of the interrogatories that were not required to be answered either asked for Dr. Whitenack's opinion as to the consensus in the medical community regarding some of his treatment techniques, or concerned his treatment of other patients, topics which were clearly outside the scope of the hearing. The others called for information that was not central to her claims. We find that the board's failure to require answers to these specific interrogatories did not deny Ms. Sprague the opportunity to have her complaint fairly heard. *See* RSA 329:18, I.

Ms. Sprague further contends that the board wrongfully excluded relevant evidence. According to a board rule, "[t]he board shall determine the admissibility of evidence. While the board shall not be bound by the technical rules of evidence, nevertheless, irrelevant, immaterial, or unduly repetitious evidence *shall* be excluded." N.H. ADMIN. RULES, Med 204.03(b) (emphasis added). The Administrative Procedure Act also states that the board is not bound to apply the rules of evidence. RSA 541-A:18, II (Supp. 1988). Although neither the rule nor the statute specifies what must be admitted in evidence, decisions by the board must be consistent with the requirement of a fair hearing. *See* RSA 329:18, I.

Ms. Sprague specifically makes the following claims. First, she claims that the board erred in excluding a writ which had been filed against Dr. Whitenack by the estate of a former patient. The writ charged that Dr. Whitenack, by negligently caring for the decedent, was responsible for the decedent's committing suicide.

Counsel for Ms. Sprague asked that the writ be admitted not to establish the merit of the underlying claim, but to show the emotional strain it placed upon Dr. Whitenack. Ms. Sprague's counsel had submitted evidence to the board supporting the claim that a doctor who is suffering from emotional pressures is most likely to exploit his patients for his own needs.

 Exploitation of a patient to gratify a doctor's own needs explicitly violates the American Medical Association's Principles of Medical Ethics as annotated by the American Psychiatric Association. The board itself also recognized that one of the issues before it was whether Dr. Whitenack had "exploited" Ms. Sprague. Although the writ concerned Dr. Whitenack's treatment of another patient, it was nevertheless relevant to an issue within the scope of the hearing. Forbidding the introduction of the writ for the limited purpose expressed by counsel hampered counsel's ability to prove an important allegation of the complaint, without enhancing a countervailing interest. The board, which would be reviewing the writ, could certainly understand the limited purpose for which it was being admitted and not allow it to prejudice Dr. Whitenack. We therefore hold that the board abused its discretion in failing to admit the writ for the limited purpose expressed by Ms. Sprague's counsel.

We note that although the board viewed the question of exploitation as within the scope of the hearing and found that Dr. Whitenack had not "exploited" Ms. Sprague, the board appears to have held a very narrow conception of exploitation, equating it with sexual impropriety. The board's discussion of exploitation contained in its decision makes no mention as to whether Dr. Whitenack exploited Ms. Sprague, in the sense of using her to gratify his own emotional, rather than sexual, needs. In its annotations to the Principles of Medical Ethics (1981), the American Psychiatric Association states that a "psychiatrist's ethics and professional responsibilities preclude him/her [from] gratifying his/her own needs by exploiting the patient." This prohibition does not distinguish between sexual and emotional needs or sexual and other exploitation.

 Ms. Sprague claims as well that the board erred in excluding testimony by her husband, Robert Sprague. Counsel for petitioner sought to call Mr. Sprague to testify as to how his wife reacted to the treatment by Dr. Whitenack and the effect her reaction had on their family, including their two children. The board ruled that Mr. Sprague would not be permitted to testify

initially. Instead, at the completion of the case, counsel could make a specific offer of proof. Although an assessment of damages was not an issue in the proceeding, the harm Ms. Sprague may have suffered is clearly relevant to understanding the quality of the treatment which Ms. Sprague received. While a bad result certainly does not require a finding of misconduct, an inability to demonstrate the effect of the treatment makes it difficult to prove misconduct. Because the board was not required to believe Ms. Sprague's testimony regarding the effect of the treatment even if undisputed, Mr. Sprague's testimony would not have been "unduly repetitious." *See* N.H. ADMIN. RULES, Med 204.03(b). The board should have permitted his testimony.

Ms. Sprague argues as well that the board unfairly restricted the scope of the testimony given by the Reverend Wesley Burwell, a certified pastoral counselor who had counselled the Spragues during and after the period that Dr. Whitenack was treating Ms. Sprague. The board ruled that Mr. Burwell could testify regarding the symptoms displayed by the complainant, but that he could not testify regarding his opinion of that treatment. The board based its ruling on two reasons: (1) Mr. Burwell is not a medical doctor; and (2) his testimony would be cumulative because Ms. Sprague already intended to call a medical expert.

We hold that the board erred in so restricting the testimony of Mr. Burwell. Although Mr. Burwell is not a medical doctor, he is a pastoral counselor certified by the State. Mr. Burwell testified that his certification allows him to practice psychotherapy, and that he presently practices with a number of other mental health care providers, including two psychiatrists. The State has recognized the important counselling role played by the pastoral counselor by according client communications with a pastoral counselor the same privilege of confidentiality accorded communications with certified psychologists. *See* RSA 330-A:19. We therefore hold that it was error for the board to exclude his testimony regarding the appropriateness of the treatment rendered by Dr. Whitenack solely because he is a pastoral counselor rather than a medical doctor. Of course, the board could accept or reject his testimony. In addition, although at some point the board may prohibit expert testimony as "cumulative," Mr. Burwell's testimony as the third planned expert witness cannot be considered as such. This is especially true, given that Mr. Burwell was the only expert who had counselled the Spragues during and after Dr. Whitenack's treatment, and thus would have provided a unique contribution.

Ms. Sprague's last evidentiary claim involves the exclusion of opinions rendered by a clinical psychologist with a Ph.D, and two social workers with master's degrees in social work. Ms. Sprague visited both the psychologist and one of the social workers soon after leaving Dr. Whitenack's care; she currently receives counselling from the other social worker. Records of Ms. Sprague's visits with these mental health care providers were admitted in evidence. However, the portions of the record containing their opinions concerning the treatment that Dr. Whitenack had rendered Ms. Sprague were excluded. These opinions, according to the testimony of Ms. Sprague, were based completely on information which she had provided to them. Exactly what information was provided was never established. Where the opinions thus lacked foundation, and no reasonable trier of fact could have relied on them, the board did not err in excluding them.

Ms. Sprague argues that the board erred in failing to respond to her request for findings of fact and rulings of law. We agree. RSA 541-A:20 (Supp. 1988) states: "[I]f, in accordance with agency rules, a party submitted proposed findings of fact, the decision *shall* include a ruling upon each proposed finding." (Emphasis added.) New Hampshire Administrative Rules, Med 204.06(c) provides that a "party may ... submit a written request for specific findings of fact." In the instant case, Ms. Sprague submitted a written request for specific findings of fact in accordance with the agency rule. The agency, therefore, was obligated to rule upon each proposed finding. The word "shall" contained in the statute does not permit discretion on the part of the board. *See Appeal of Concord Natural Gas Corp.*, 121 N.H. 685, 690–91, 433 A.2d 1291, 1295 (1981). We caution, however, that unduly excessive requests for findings need not be answered by the board.

The State, as *amicus curiae* supporting the board decision, responds with two arguments. First, it argues that Ms. Sprague had not acted in accordance with agency rules. At the final preliminary hearing, the board stated that each party could submit proposed findings of fact, but that the board would not necessarily respond to them. The board claims that by making this statement at the preliminary hearing it had modified the rules. However, the board could not modify its rules in this manner. RSA chapter 541-A (Supp. 1988) provides procedures for rulemaking by the board which include filing a notice of a proposed rule and holding a public hearing. RSA 541-A:3, I, :3, II (Supp. 1988); *see* RSA 329:9

(giving board rulemaking authority pursuant to RSA ch. 541-A). Neither can it be contended that Ms. Sprague, by failing to object, consented to this change in procedure, *see* RSA 541-A:16, V(c)(5) (Supp. 1988). Even if the refusal to rule on proposed findings of fact was considered a change "to standard procedures desired during the hearing," *id.*, "consent" in this context would require more than silence.

 The State argues as well that the rule requiring rulings on proposed findings of fact is not intended to require the board literally to respond to every requested finding of fact. Instead, the State argues, its purpose is to ensure that a decision by the board reveals the factual findings the board made which support the decision, and thus to allow the decision to be reviewed. However, the language of the statute requires that more than merely sufficient findings be made. The plain meaning of the requirement that, when requested in accordance with agency rules, a "decision shall include a ruling upon each proposed finding" is also supported by the statutory provision as a whole. Two sentences before this requirement, RSA 541-A:20 states that "[a] final decision shall include findings of fact and conclusions of law, separately stated." If the purpose of the requirement that the "decision shall include a ruling upon each proposed finding" was intended to ensure only that adequate findings of fact had been made, the legislature need not have included this requirement, since the statement two sentences above it already required "findings of fact ... [to be] separately stated." Since we assume that the legislature would not have included a provision which is mere surplusage, *see Merrill v. Great Bay Disposal Serv.*, 125 N.H. 540, 543, 484 A.2d 1101, 1103 (1984), we read the provision to require a ruling on each proposed finding, so long as the requests are not unduly excessive. We note that a requirement of a ruling on each proposed finding has no analogue in RSA 491:15, which requires a court upon request by a party merely to give a "decision in writing, stating the facts found and .... rulings of law." *See also* SUPER. CT. R. 72.

 Ms. Sprague contends as well that bias was exhibited by the board's restrictions on the cross-examination of Dr. Whitenack, rulings on her discovery requests, and exclusion of evidence, together with comments made by the board concerning the expedition of the proceedings, and comments directed to Ms. Sprague or her attorney. Dr. Whitenack first counters that the issue of bias was not raised in a timely fashion. We hold that the issue of bias, which was first raised in her motion for rehearing, was

timely raised. *See Appeal of Lathrop,* 122 N.H. 262, 444 A.2d 505 (1982) (issue of prejudgment raised following hearing and decision of water resources board). We therefore address the issue.

An impartial tribunal is an essential element of a fair hearing. *Cf. Appeal of Portsmouth Savings Bank,* 123 N.H. 1, 4, 455 A.2d 1023, 1025 (1983) (basic requirement of due process is right to be heard by impartial board). Based upon a careful review of the record, however, we do not find that the board or any of its members had a conflict of interest, entertained ill-will towards any party, or prejudged the facts in the specific case prior to the hearing. *See N.H. Milk Dealers' Ass'n v. Milk Control Board,* 107 N.H. 335, 338–39, 222 A.2d 194, 198 (1966). The record developed in the three preliminary hearings, as well as in the twelve-hour evidentiary hearing, exhibit an effort by the board to conduct a fair and thorough hearing, although it failed to do so in several important respects, as discussed above. The length of the evidentiary hearing and the questioning by the board members of the various witnesses, especially Dr. Whitenack, reveal an attempt by the board to understand what had occurred. Although counsel for Ms. Sprague points to specific statements made by the board during the hearing which allegedly display ill-will towards Ms. Sprague, the record also contains words of advice and gratitude for her cooperation. We hold that Ms. Sprague has not adequately demonstrated bias. *See Appeal of Beyer,* 122 N.H. 934, 941, 453 A.2d 834, 838 (1982).

Ms. Sprague has attempted to support her claim of bias by filing a motion which requests this court to take judicial notice of three items. These are: (1) board records which indicate that the board has received 137 malpractice writs since 1985 but has not taken disciplinary action against any of the physicians named therein; (2) legislative testimony of Dr. Black, a member of the board, discussing the "medical malpractice crisis" before the Commission on Tort Law and Insurance Availability established by the New Hampshire Legislature; and (3) a refusal by the Ethics Committee of the New Hampshire Psychiatric Society to reconsider its decision to suspend Dr. Whitenack's membership in the society for two years and to monitor his practice during that time based on Ms. Sprague's complaint.

Even if we were to take judicial notice of these items, however, such recognition would not alter our holding regarding bias, and we therefore deny the motion. RSA 329:17 requires the clerk of the superior court to report to the board all writs filed in a medical injury action. RSA 329:17, II. The statute also requires insurers to

report a settlement or award of damages arising out of an action for medical injury. RSA 329:17, III. It requires hospitals to report a loss of privilege by a doctor. RSA 329:17, IV. It requires every professional society of physicians to report disciplinary actions taken for various reasons as well. RSA 329:17, V. The statute also provides for the board to receive complaints from people who believe a person licensed by the board has committed misconduct. RSA 329:17, I. Thus, recognition that the board has not taken disciplinary action against any of the physicians named in writs since 1985 does not establish a pattern of discrimination or prejudgment, as we have no idea whether the board has taken disciplinary action in any actions or complaints which have been brought to its attention via other avenues. We also caution that the filing of a writ does not reflect the merits of the allegations contained therein.

We note as well that Dr. Black, in his legislative testimony on the "medical malpractice crisis," emphasized the importance of the board's role in ridding the state of "bad" doctors. Thus, his testimony, far from supporting the notion that he would prejudge the case or harbor ill-will towards Ms. Sprague, can be understood as indicating a disposition to take each case seriously. Further, a decisionmaker will not be judged to be biased merely because he has taken a position on a policy issue. See Appeal of Lathrop, 122 N.H. at 265, 444 A.2d at 507. Finally, we note that the decision of the New Hampshire Ethics Committee not to reconsider its decision, which was made without benefit of the extensive discovery undertaken in the proceeding before the board, has no bearing on our decision.

Because we decide that the decision of the board must be vacated and the case remanded for further proceedings, we do not reach Ms. Sprague's claims that the decision reached by the board is against the clear weight of the evidence and that the board abused its discretion in failing to impose sanctions on Dr. Whitenack for his breach of patient confidentiality.

Finally, we note briefly Dr. Whitenack's argument that the court erred in utilizing the "preponderance of evidence" burden of proof standard, rather than the higher standard of "clear and convincing evidence." Counsel for Dr. Whitenack has stated in his brief that an argument based on equal protection or due process could be made. The brief, however, does not make this argument. Rather it focuses on which standard is the better one. New Hampshire Administrative Rules, Med 204.06(b) states that the

"board's decision shall be based upon the preponderance of evidence presented at the disciplinary hearing," and as we have stated before, we will not "substitute our judgment on the wisdom of the rules" for that of the board. *Appeal of Concord Natural Gas Corp.*, 121 N.H. at 692, 433 A.2d at 1296. Thus, we will set aside a rule only upon a showing that it is unlawful. *See* A. BONFIELD, STATE ADMINISTRATIVE RULE MAKING § 9.1 (1986); 2 F. COOPER, STATE ADMINISTRATIVE LAW 781–96 (1965). Because Dr. Whitenack has not been found by the board to have acted inappropriately under either standard, except for his admitted breach of confidentiality, and because the issues regarding the lawfulness of the rule have not been briefed, we do not determine whether the higher standard must be applied.

Accordingly, we remand the case for additional proceedings consistent with this opinion. To the extent that the board will receive additional evidence, the board need not hold a completely new hearing. Any board members who did not sit in the original proceeding will be allowed to participate by reading the transcript of the prior hearing.

*Vacated and remanded.*

SOUTER, J., with whom THAYER, J., joined, dissented in part; the others concurred.

SOUTER, J., dissenting in part: I agree with the decision to remand the case with instructions to respond to the petitioner's requests for findings of fact in accordance with the board's own rules, as required by RSA 541-A:20 (Supp. 1988). I respectfully dissent, however, from the mandate to reopen the evidentiary record.

I disagree with the majority's holding that it was error to exclude the opinion of a pastoral counselor about the appropriateness of the psychiatric treatment provided by Dr. Whitenack. Under the rule that the admissibility of proffered opinion testimony turns on its potential aid to the fact-finder in the search for truth, *see Belleau v. Hopewell*, 120 N.H. 46, 53, 411 A.2d 456, 461 (1980), I can not say that the board was wrong as a matter of law in concluding that the opinion of a pastoral counselor about the propriety of psychiatric treatment would not be of value to it. Even if I were in doubt about this, I would resolve such doubt against finding reversible error, given the fact that the board did receive testimony from a psychiatric witness unquestionably qualified to give an opinion on the subject.

Nor do I believe that the petitioner has demonstrated reversible error in the board's termination of cross-examination of Dr. Whitenack by petitioner's counsel. In the course of that cross-examination, counsel covered the subjects of ethical violation in revealing another patient's name, Dr. Whitenack's philosophy of treatment, his practice of telling patients about his own life, and the appropriateness of hugging a patient in the petitioner's condition. Just before the board ended the examination, counsel had stated he was nearly finished, and before he was stopped he had introduced evidence tending to show that an author whose views on treatment allegedly coincided with those of Dr. Whitenack enjoyed no professional eminence. The cross-examination was evidently winding down, and the facts give no indication that counsel had a further subject to pursue. Nor did he make any such claim when he excepted to the board's position; although he objected to the limitation on the duration of his examination, he made no reference to any subject that he had thereby been precluded from covering. I therefore see no justification for reopening the testimony for further cross-examination.

With respect to the two final errors cited by the majority, exclusion of the writ and of testimony from the petitioner's husband, I will assume that error was committed, but I believe it was harmless. Proof that a suit was pending against the doctor may well have enhanced the likelihood that he would exploit a patient, and the husband's evidence may well have underscored the petitioner's own testimony, and that of the pastoral counselor, about the consequences of the doctor's behavior. But the petitioner has not demonstrated that these errors together affected the outcome of the hearing. *See Place v. Place*, 129 N.H. 252, 260, 525 A.2d 704, 709 (1987). Consequently, I would not require the evidentiary record to be reopened.

THAYER, J., joins in the dissent of SOUTER, J.